UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

V.D., individually and on behalf of J.M.D. and N.M.D., minor
children; T.S., individually and on behalf of C.S., a minor child;
S.K., individually and on behalf of A.K., a minor child; P.E.T.
and H.T., individually and on behalf of D.T., a minor child; and
B.C., individually and on behalf of D.C., a minor child,

                              Plaintiffs,

 v.

STATE OF NEW YORK; ANDREW M. CUOMO,                          19-CV-4306 (ARR)(RML)
GOVERNOR (in his official capacity); LETITIA JAMES,
ATTORNEY GENERAL (in her official capacity); NEW YORK
STATE EDUCATION DEPARTMENT; MARYELLEN ELIA,
COMMISSIONER OF NEW YORK STATE EDUCATION
DEPARTMENT (in her official capacity); and ELIZABETH
BERLIN, EXECUTIVE DEPUTY COMMISSIONER OF NEW
YORK STATE EDUCATION DEPARTMENT (in her official
capacity),

                              Defendants.

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**LETITIA JAMES**
Attorney General of the State of New York
*Attorney for Defendants*
28 Liberty Street
New York, New York 10005
(212) 416-8910

*Of Counsel:*

Elyce N. Matthews
August 13, 2019

# TABLE OF CONTENTS

**Pages**

**TABLE OF AUTHORITIES** ................................................................................ i

**PRELIMINARY STATEMENT** ........................................................................1

**STATEMENT OF FACTS**................................................................................2

    A. New York Public Health Law § 2164 and the Overarching Public Health Concerns it Addresses ...........................................................................................................2
    B. The Current Measles Outbreak ....................................................................4
    C. The June 1, 2019 Amendment to New York Public Health Law § 2164 ...........6
    D. The Individuals with Disabilities Education Act ..............................................7
        1. SED's Role in Administering IDEA
        2. The Development of Individual Education Programs and the Assurance of a Free Appropriate Public Education
        3. Procedural Safeguards and New York's Two Tiered Due Process System
        4. Students with Disabilities in Nonpublic School Settings in New York State
    E. Procedural History ......................................................................................13

**ARGUMENT** ..................................................................................................15

**POINT I:** ALTHOUGH STYLED AS AN IDEA PREEMPTION CLAIM, PLAINTIFFS ARE FUNDAMENTALLY ARGUING THAT THEY SHOULD BE ALLOWED A RELIGIOUS EXEMPTION TO THE STATE'S MANDATORY VACCINATION REQUIREMENT, AN ARGUMENT WHICH COURTS HAVE REPEATEDLY REJECTED. ..................................................15

**POINT II:** PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR PREEMPTION CLAIMS ...............18

    A. IDEA DOES NOT PREEMPT N.Y. PUB. HEALTH LAW § 2164..........18

    B. NEW YORK STATE PROVIDES SPECIAL EDUCATION SERVICES TO STUDENTS WITH DISABILITIES WHO ARE HOME SCHOOLED. ...........................................................................................22

    C. IDEA'S SILENCE REGARDING MANDATORY VACCINATION DOES NOT MEAN IDEA PREEMPTS A STATE PUBLIC HEALTH LAW REQUIRING IT. ..........................................................................24

D.  PHL § 2164 DOES NOT, ON ITS OWN, TRIGGER IDEA'S
PROCEDURAL SAFEGUARDS...............................................................29

1.  The Stay Put Provision is Inapplicable to Plaintiffs' Situation
2.  Plaintiffs Do Not Allege Systemic IDEA Claims

**POINT III:** PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE
HARM ABSENT INJUNCTIVE RELIEF ……………………………..   34

**POINT IV:** THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST
STRONGLY FAVOR THE ENFORCEMENT OF PHL § 2164,
AS AMENDED…………………………………………………………   36

**CONCLUSION** ....................................................................................................... 39

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Able v. U.S,*
    44 F.3d 128 (2d Cir. 1995)..............................................................14

*Altria Grp., Inc. v. Good,*
    555 U.S. 70 (2008)....................................................................18, 26

*Antkowiak v. Ambach,*
    838 F.2d 635 (2d Cir.1988).............................................................27

*Bates v. Dow Agrosciences LLC,*
    544 U.S. 431 (2005)........................................................................26

*Bay Shore Union Free Sch. Dist. v. Kain,*
    485 F.3d 730 (2d Cir. 2007)........................................................27, 28

*Bd. of Educ. v. Rowley,*
    458 U.S. 176 (1982)........................................................................10

*Board of Educ. v. Pico,*
    457 U.S. 853 (1982) .......................................................................25

*Bryant v. New York State Educ. Dep't*
    692 F.3d 202, 213-214 (2d Cir. 2012) ...........................................27

*Burlington v. Dep't of Educ.,*
    736 F.2d 773 (1st Cir. 1984) ......................................................27, 28

*Catanzano v. Dowling,*
    847 F. Supp. 1070, 1081, 1084 (W.D.N.Y. 1994).........................30

*Catanzano v. Wing,*
    277 F.3d 99, 102 (2d Cir. 2001)......................................................30

*Caviezel v. Great Neck Public Schools,*
    739 F. Supp. 2d 273 (E.D.N.Y. 2010) ............................................17

i

*Caviezel v. Great Neck Public Schools,*
500 Fed. App'x 16 (2d Cir. 2012)...........................................................................................17

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,*
696 F.3d 206 (2d Cir. 2012)....................................................................................................13

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992)................................................................................................................26

*City of New York v. Miller,*
20 Misc. 3d 1117(A) (Sup. Ct. Kings Cty. 2008) ..................................................................38

*Coleman v. Newburgh Enlarged City Sch. Dist.,*
319 F. Supp. 2d 446 (S.D.N.Y. 2004)....................................................................................36

*Coleman v. Newburgh Enlarged City Sch. Dist.*
503 F.3d 198 (2d Cir. 2007) ..................................................................................................36

*D.D. ex rel. V.D. v. New York City Bd. of Educ.,*
480 F.3d 138 (2d Cir. 2007)...................................................................................................28

*D.M. v. New Jersey Dep't of Educ.,*
801 F.3d 205 (3d Cir. 2015)...................................................................................................31

*DeLeon v. Susquehanna Cmty. Sch. Dist.,*
747 F.2d 149 (3d Cir. 1984)...................................................................................................31

*Desiano v. Warner-Lambert & Co.,*
467 F.3d 85 (2d Cir. 2006).....................................................................................................25

*Donohue v. Mangano,*
886 F. Supp. 2d 126 (E.D.N.Y. 2012) ...................................................................................35

*E. Ramapo Cent. Sch. Dist. v. DeLorenzo,*
2013 WL 5508392 (S.D.N.Y. Oct. 3, 2013) ....................................................................19, 20

*eBay, Inc. v. MercExchange,*
547 U.S. 388 (2006)................................................................................................................37

*Edwards v. Aguillard,*
  107 S. Ct. 2573 (1987)  F.3d 72 (2d Cir. 2015)....................................................25

*Employment Div., Dep't of Human Res. of Oregon v. Smith,*
  494 U.S. 872 (1990)....................................................................................16

*English v. Gen. Elec. Co.,*
  496 U.S. 72 (1990)......................................................................................19

*Epperson v. Arkansas*, 393 U.S. 97, 104 (1968),
  393 U.S. 97 (1968)......................................................................................25

*Evans v. Evans,*
  818 F. Supp. 1215 (N.D. Ind. 1993)*,* ..........................................................28

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
  559 F.3d 110 (2d Cir. 2009)........................................................................35

*Fosmire v. Nicoleau,*
  75 N.Y.2d 218 (1990)………………………………………..........................................16

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
  841 F.3d 133 (2d Cir. 2016)........................................................................14

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
  481 F.3d 60 (2d Cir. 2007) ........................................................................35

*Handberry v. Thompson,*
  446 F.3d 335 (2d Cir. 2006)........................................................................33

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
  725 F.3d 65 (2d Cir. 2013).........................................................19, 20, 21, 25, 26

*J.M. by & through Mandeville v. Matayoshi,*
  729 F. App'x 585 (9th Cir. 2018) ................................................................30

*J.M. v. Dep't of Educ., State of Hawai'i,*
  224 F. Supp. 3d 1071 (D. Haw. 2016)*,* ......................................................30

*J.S. ex rel. N.S. v. Attica Cent. Sch.,*
  386 F.3d 107 (2d Cir. 2004)........................................................................33

iii

*Karmel v. City of New York,*
200 F. Supp. 2d 361 (S.D.N.Y. 2002) ...................................................................14

*Lore v. City of Syracuse*
2001 WL 263051 (N.D.N.Y. Mar. 9, 2001) ...........................................................35

*Madeira v. Affordable Hous. Found., Inc.,*
469 F.3d 219 (2d Cir. 2006)...........................................................................21, 26

*Marentette v. Abbott Labs., Inc.*,
886 F.3d 112 (2d Cir. 2018)..................................................................................19

*Maryland v. Louisiana,*
451 U.S. 725 (1981),.............................................................................................18

*McDermott v. City of Albany,*
309 A.D.2d 1004 (Sup. Ct. Albany Co. 2003).......................................................38

*Medtronic, Inc. v. Lohr,*
518 U.S. 470, 485 (1996),........................................................................ 18, 19, 25

*Million Youth March, Inc. v. Safir,*
155 F.3d 124 (2d Cir. 1998) .................................................................................37

*Mrs. C. v. Wheaton,*
916 F.2d 69 (2d Cir.1990).....................................................................................27

*Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*,
297 F.3d 195 (2d Cir. 2002)...........................................................................9, 30

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32, 36 (2d Cir. 2018)..............................................................................13

*N.D. ex rel. Parents Acting as Guardians Ad Litem v. Haw. Dep't of Educ.,*
600 F.3d 1104 (9th Cir. 2010) ..............................................................................31

*N.M. v. Hebrew Acad. Long Beach,*
155 F. Supp. 3d 247 (E.D.N.Y. 2016) ............................................................13, 18

*New York SMSA Ltd. P'ship v. Town of Clarkstown,*
612 F.3d 97 (2d Cir. 2010).............................................................................18, 19, 26

iv

*New York State Rifle & Pistol Ass'n v. City of New York*,
  86 F. Supp. 3d 249 (S.D.N.Y. 2015) ................................................................37

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
  883 F.3d 45 (2d Cir. 2018) ............................................................................37

*Olson v. Wing*,
  281 F. Supp. 2d 476 (E.D.N.Y. 2003) ...........................................................14

*Olson v. Wing*,
  66 F. App'x 275 (2d Cir. 2003) ......................................................................14

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*,
  769 F.3d 105 (2d Cir. 2014) ..........................................................................14

*P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*,
  546 F.3d 111 (2d Cir. 2008) ..........................................................................23

*Patrick v. Success Acad. Charter Sch., Inc.*,
  354 F. Supp. 3d 185 (E.D.N.Y. 2018) ...........................................................25

*Phillips v. City of New York*,
  775 F.3d 538 (2d Cir. 2015) ............................................................16, 17, 35

*Plaza Health Labs., Inc. v. Perales*,
  878 F.2d 577 (2d Cir. 1989) ..........................................................................14

*Pope v. Cnty. of Albany*,
  687 F.3d 565 (2d Cir. 2012) ..........................................................................14

*Prince v. Massachusetts*,
  321 U.S. 158 (1944) ................................................................................7, 16

*R.B. v. Mastery Charter School*,
  532 Fed. App'x. 136 (3d Cir. 2013) ...............................................................31

*R.E. v. N.Y. City Dep't of Educ.*,
  694 F.3d 167 (2d Cir. 2012) ............................................................................9

*R.E.B. v. State of Hawaii Dep't of Educ.*,
  870 F.3d 1025 (9th Cir. 2017) .......................................................................30

*Ramanadhan v. Wing*
    257 A.D.2d 383 (1st Dep't 1999) ........................................................38

*S.W. by J.W. v. Warren*,
    916 F.2d 69 (2d Cir.1990)....................................................................33

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................37

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)...................................................................37

*Sarah M. v. Weast*,
    111 F. Supp. 2d 695 (D. Md. 2000) ....................................................28

*Scaggs v. N.Y. State Dep't of Educ.*,
    2007 WL 1456221 (E.D.N.Y. May 16, 2007) ......................................33

*Schaffer v. Weast*,
    546 U.S. 49 (2005)...............................................................................27

*Seifullah v. City of New York*,
    2017 WL 4339478 (E.D.N.Y. Sept. 27, 2017) ....................................34

*Sherr v. Northport–East Northport Union Free Sch. Dist.*,
    672 F. Supp. 81 (E.D.N.Y. 1987) ........................................................17

*Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*,
    468 F. App'x 43 (2d Cir. 2012) ...........................................................34

*Standard & Poor's Corp. v. Commodity Exchange, Inc.*,
    683 F.2d 704 (2d Cir. 1982)................................................................37

*T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*,
    752 F.3d 145 (2d Cir. 2014) ...............................................................23

*Taylor v. Vermont Dep't of Educ.*,
    313 F.3d 768 (2d Cir. 2002)..........................................................26, 27

*Tinker v. Des Moines School Dist.*,
393 U.S. 503 (1969) ........................................................................................25

*UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*,
660 F.3d 643 (2d Cir. 2011)............................................................................13

*Ulysse v. AAR Aircraft Component Servs.*,
841 F. Supp. 2d 659 (E.D.N.Y. 2012) ............................................................20

*Viemester v. White*,
179 N.Y. 235 (1904) ..................................................................................16, 35

*Wachovia Bank, N.A. v. Burke*,
414 F.3d 305 (2d Cir. 2005)............................................................................19

*Walczak v. Florida Union Free Sch. Dist.*,
142 F.3d 119 (2d Cir. 1998)............................................................................36

*Watkins-El v. Dep't of Educ.*,
2016 WL 5867048 (E.D.N.Y. Oct. 6, 2016),...................................................17

*Weil v. Bd. of Elementary & Secondary Educ.*,
931 F.2d 1069 (5th Cir. 1991), ......................................................................31

*Weinberger v. Romero–Barcelo*,
456 U.S. 305 (1982)........................................................................................37

*Weinstein v. Krumpter*,
120 F. Supp. 3d 289 (E.D.N.Y. 2015) ............................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)............................................................................... 13, 35, 37

*Workman v. Mingo County Bd. of Educ.*,
419 Fed. App'x at 356 (4th Cir. 2011) ...........................................................35

*Wyeth v. Levine*,
555 U.S. 555 (2009).......................................................................... 18, 19, 26

**United States Constitution**

U.S. Const. Art. VI, clause 2.................................................................... 18

**Federal Statutes and Rules**

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* ............... passim

Individuals with Disabilities Education Improvement Act of 2004 ("IDEA 2004")................. 7, 8

20 U.S.C. § 1400(d) ............................................................................ 8, 24

20 U.S.C. § 1401(9). ................................................................................. 8

20 U.S.C. § 1412 ................................................................................. 9, 27

20 U.S.C. § 1412(a)(1)(A) ........................................................................... 8

20 U.S.C. § 1412(a)(11)(A)(i) ....................................................................... 9

20 U.S.C. § 1412(a)(11)(A)(ii)(II) ................................................................... 9

20 U.S.C. § 1413(a)(1)............................................................................ 8, 9

20 U.S.C. § 1414(d)(1)(A) ........................................................................... 9

20 U.S.C. § 1414(d)(1)(B) .......................................................................... 10

20 U.S.C. § 1414(d)(2)(A) ........................................................................... 9

20 U.S.C. § 1415 ......................................................................... 13, 31, 32

20 U.S.C. § 1415(a) ................................................................................ 10

20 U.S.C. § 1415(b)(3) ............................................................................. 29

20 U.S.C. § 1415(f)................................................................................. 11

20 U.S.C. § 1415(f)(1)(B) .......................................................................... 10

20 U.S.C. § 1415(g) ................................................................................ 11

20 U.S.C. § 1415(i)(2)(A)........................................................................... 11

20 U.S.C. § 1415(j)............................................................................. 30, 31

20 U.S.C. § 1416(a)(1)(C)(i) ................................................................... 9

20 U.S.C. § 1416(a)(3) ............................................................................ 9

**Federal Rules and Regulations**

34 C.F.R. § 300.323(a) ............................................................................ 9

34 C.F.R. § 300.503 ......................................................................... 29, 31

34 C.F.R. § 300.507 .............................................................................. 31

71 Fed. Reg. 46,540, 46,594 (Aug. 14, 2006) .................................. 11, 22

**New York State Statutes**

N.Y. Educ. Law 3602-c ........................................................................ 22

N.Y. Educ. Law § 3602-c (2-c) ............................... 11, 12, 15, 21, 22, 23

N.Y. Educ. Law § 4401, *et seq.* ............................................................. 8

N.Y. Educ. Law § 4402(1)(b)(1) .......................................................... 10

N.Y. Educ. Law § 4404 ................................................................... 13, 31

N.Y. Educ. Law § 4404-a ..................................................................... 11

N.Y. Educ. Law § 4404(1) .................................................................... 11

N.Y. Educ. Law § 4404(2) .................................................................... 11

N.Y. Educ. Law § 4404(3)(a) ............................................................... 11

N.Y. Educ. Law. § 3205 ....................................................................... 15

New York Public Health Law § 2164 .............................................. passim

New York Public Health Law § 2164(1)(a) ........................................ 2, 6

New York Public Health Law § 2164(8) ............................................. 2, 6

## New York State Rules and Regulations

8 N.Y.C.R.R. § 200.1, *et seq.*............................................................................... 8

8 N.Y.C.R.R. § 200.4(d)(2) ...................................................................................... 9

8 N.Y.C.R.R. § 200.5(a) .......................................................................................... 29

8 N.Y.C.R.R. § 200.5(j)(2) ...................................................................................... 10

8 N.Y.C.R.R. §100.10............................................................................................. 12

8 N.Y.C.R.R. 100.10(d) .......................................................................................... 12

8 N.Y.C.R.R. 100.10(e) ........................................................................................... 12

Defendants State of New York, Governor Andrew Cuomo, Attorney General Letitia James, the New York State Education Department ("SED"), SED Commissioner MaryEllen Elia, and SED Executive Deputy Commissioner Elizabeth Berlin (collectively, the "Defendants") respectfully submit this memorandum of law in opposition to Plaintiffs' motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

In the midst of the worst measles outbreak in more than twenty-five years, to protect vulnerable children, immunocompromised individuals, and the general public, the New York State Legislature eliminated the non-medical exemption from the state's mandatory immunization statute, Public Health Law ("PHL") § 2164, in June 2019. Under well-established precedent, mandatory vaccination laws are constitutional, and non-medical exemptions are not required. However, despite this clear, binding case law, Plaintiffs, a group of parents whose children are students with disabilities, seek a preliminary injunction exempting them from PHL § 2164. As demonstrated herein, PHL § 2164 is a public health statute and does not serve to deny special education services to any students who are eligible. Therefore, Plaintiffs' claims in this action are fatally flawed for several reasons. Most critically, Plaintiffs improperly frame this case as a conflict between the Individuals with Disabilities Education Act ("IDEA") and New York State's requirement that all students attending school must be vaccinated against certain communicable diseases. Rather, at its core, this lawsuit seeks to challenge the legislature's lawful repeal of the religious exemption to the mandatory vaccination requirement. Courts have repeatedly rejected such challenges, and this Court should do the same here.

In light of the well-established precedent that vaccination requirements are lawful, Plaintiffs cannot meet any of the required elements for a preliminary injunction. First, Plaintiffs

cannot demonstrate a likelihood of success on the merits of their preemption claim because there is no irreconcilable conflict between PHL § 2164 and the purpose of IDEA.  *See* Point II, *infra*. Second, Plaintiffs have not carried their burden to show that they will be irreparably harmed in the absence of a preliminary injunction, because their children are eligible for special education services.  *See* Point III, *infra*.  Finally, Plaintiffs cannot show that the balance of hardships tips decidedly in their favor or that the proposed injunction is in the public interest.  *See* Point IV, *infra*.  Accordingly, the Court should deny Plaintiffs' motion for a preliminary injunction.

## STATEMENT OF FACTS

### A.  New York Public Health Law § 2164 and the Overarching Public Health Concerns it Addresses

New York Public Health Law § 2164 requires children to be immunized from certain communicable diseases before they can attend "any public, private or parochial child caring center, day nursery, day care agency, nursery school, kindergarten, elementary, intermediate or secondary school."  PHL § 2164(1)(a).  The statute contains a narrow medical exemption for those cases in which a physician determines that a vaccine would be detrimental to the child's health.  PHL § 2164(8).  As discussed below, as of June 13, 2019, the statute no longer contains a non-medical exemption for children whose parents object to vaccination on religious grounds.

Measles is a highly contagious viral disease transmitted via the airborne route when an infected person coughs or sneezes.  Following exposure to the virus about 90% of people who are susceptible will develop measles.  Blog Decl. ¶ 4.[1]  It is considered so contagious that if one person is infected, approximately 90% of the people close to that person who are not immune will also become infected.  Blog Decl. ¶ 5.  Measles is characterized by a period of fever

---

[1] Defendants respectfully refer the Court to the Declaration of Debra Blog ("Blog Decl."), the Director of the Division of Epidemiology at the New York State Department of Health, for a more comprehensive account of the measles virus and the current measles outbreak.

followed by cough, coryza, and/or conjunctivitis, and a rash that lasts for 5-6 days. Those who are infected can spread measles to others from 4 days before through 4 days after this rash appears. Blog Decl. ¶ 6.

Measles is a very serious disease, especially for children under 5 years of age and adults over 20 years of age; one or two children will die for every 1,000 cases, despite the best medical care. Blog Decl. ¶ 7. Common complications include ear infection, which can result in permanent hearing loss, and diarrhea. Severe complications include pneumonia and encephalitis. Measles can also cause premature birth in pregnant women, as well as miscarriage and low birth weight for infants. Blog Decl. ¶ 7.

PHL § 2164 identifies measles as a vaccine-preventable disease. PHL § 2164. The measles vaccine is very effective and remains the best protection against the disease. Blog Decl. ¶ 8. One dose of measles vaccine is about 93% effective at preventing the measles if exposed to the virus and two doses are about 97% effective. Blog Decl. ¶ 8. Fully vaccinated people who get the measles are much more likely to have a milder illness and are less likely to spread measles to other people, including people who cannot get vaccinated because they are too young, or they have a weakened immune system. Blog Decl. ¶ 8. The measles vaccine is extremely safe and serious side effects are rare. Blog Decl. ¶ 9.

However, even if a community has high immunization coverage rates, unvaccinated individuals are still unprotected against vaccine-preventable diseases and are still at risk if they are exposed to such diseases despite "herd immunity," which is the concept that if enough people are vaccinated in a community, the entire community is less likely to get a vaccine-preventable disease. Blog Decl. ¶ 20. Accordingly, the New York State Department of Health recommends that all schools aim for at least 95% vaccination coverage in order to optimize protection against

vaccine preventable diseases. Blog Decl. ¶ 6. Herd immunity has historically been considered to

be achieved (or virtually achieved) when, at a minimum, 95% of the population in a community

is immunized. Blog Decl. ¶ 6. Herd immunity helps to protect people in a community who

might be too young or sick to be vaccinated themselves. Blog Decl. ¶ 20.

## B.    The Current Measles Outbreak

The United States is currently experiencing the worst outbreak of measles in more than

25 years, with outbreaks in pockets of New York primarily driving the crisis.[2]  Blog Decl. ¶ 12.

The current outbreak is the largest in New York since the 1990's, prior to the elimination of

measles in the United States. Blog Decl. ¶ 12. As of August 6, 2019, there have been 386

confirmed cases of measles in New York State outside of New York City (290 in Rockland

County, 55 in Orange County, 18 in Westchester County, 14 in Sullivan County, 7 in Monroe

County, 1 in Suffolk County and 1 in Greene County.). Blog Decl. ¶ 12. Many of these

confirmed cases, particularly in Rockland County, are school age students. Blog Decl. ¶ 12.

From 2008-2017, there were about 0-7 cases of measles per year in New York State outside of

the New York City area, followed by a very marked and rapid increase in cases in 2018 and 2019

associated with the current outbreak. Blog Decl. ¶ 14.

As a result of non-medical vaccination exemptions, many communities across New York

have low rates of vaccination. Blog Decl. ¶ 15. The number of children entering school with a

valid religious exemption has risen over the years. In New York State, during the 2010-2011

---

[2] Plaintiffs' reference to Federal guidance regarding outbreaks is a red herring. Pl. Mem. at 7. The guidance
documents issued by the U.S. Department of Education's Office of Civil Rights and Office of Special Education
Programs are primarily oriented towards students with medical exemptions or students who are too sick to attend
school during an outbreak and not towards students with non-medical exemptions. Such guidance is inapplicable in
this situation. *See*, *e.g.*, Ex. 3 to Mack Rosenberg Declaration (referring to students who are "medically unable to
receive certain vaccinations because of disability."); Ex. 4 to Mack Rosenberg Declaration (referring to students'
"underlying conditions making them more susceptible to the flu."). Also, the "Measles Fact Sheet" to which
Plaintiffs cite explicitly states that IDEA "also pertains to students with disabilities in public schools, but discussion
of that law is beyond the scope of this document." Ex. 3 to Mack Rosenberg Declaration.

school year, 14,059 children entered school with religious exemptions, but by the 2017-2018 school year, this number had risen to 26,627.  Blog Decl. ¶ 15.  Conversely, the number of students entering school decreased from the 2010-2011 school year to the 2017-2018 school year, from 3,437,226 to 3,348,544 children respectively.  Blog Decl. ¶ 15.  Medical exemptions, on the other hand, have remained at relatively consistent levels: for the 2010-2011 school year, 3,365 (.10%) students entered school with a medical exemption, and for the 2017-2018 school year, 4,571 students (.14%) entered school with a medical exemption.  Blog Decl. ¶ 15.

The communities with the highest rates of measles in the current outbreak also have low vaccination coverage rates.  Blog Decl. ¶ 16.  For example, Rockland County, which as of July 24, 2019 had at least 283 confirmed measles cases, has the second lowest measles, mumps and rubella ("MMR") immunization rate in the state.  Blog Decl. ¶ 16.

Despite New York State's overall high immunization rates (98% of school-aged children have been inoculated with the MMR vaccine statewide as of 2017-2018 school year), a measles outbreak continues to affect communities where the vaccination rate is lower, particularly in areas where the inoculation rate is less than 95% and therefore herd immunity is no longer effective.  Blog Decl. ¶ 21.  Using Orange County as an example, data collected through the New York State Immunization Information System (NYSIIS) shows that the pocket of Orange County where the current measles outbreak is localized (zip code 10950), has low MMR vaccination rates.  Blog Decl. ¶ 18.  As of July 24, 2019, Orange County had at least 55 confirmed measles cases.  Blog Decl. ¶ 18.  As of July 15, 2018 (the most recent data available), NYSIIS data shows that for the Orange County zip code 10950, the MMR immunization rate for children in the age group of 1-3 is 59.4%, and only 53.8% for children ages 4-18.  Blog Decl. ¶ 18.

**C.    The June 13, 2019 Amendment to New York Public Health Law § 2164**

In June 2019, the New York State Legislature responded to the worst measles outbreak in 25 years by repealing the non-medical exemption from the State's mandatory immunization law, effective immediately.   *See* Ex. A to the Declaration of Elyce N. Matthews ("Matthews Decl.") (June 14, 2019 Statement on Legislation Removing Non-Medical Exemption from School Vaccination Requirements ("Legislation Statement")).  As previously noted, PHL § 2164 requires that all children be vaccinated from certain communicable diseases before they can attend "any public, private or parochial child caring center, day nursery, day care agency, nursery school, kindergarten, elementary, intermediate or secondary school" in New York State.  PHL § 2164(1)(a).  The statute contains a narrow medical exemption in cases where a physician determines that a vaccine would be detrimental to a child's health.  PHL § 2164(8).

The Legislature found that: "As a result of non-medical vaccination exemptions, many communities across New York have unacceptably low rates of vaccination, and those unvaccinated children can often attend school where they may spread the disease to other unvaccinated students, some of whom cannot receive vaccines due to medical conditions."  Ex. A to Matthews Decl. (Legislation Statement).  The new law's purpose is to help protect the public amid this ongoing outbreak.  *Id.*

The current version of PHL § 2164 took effect on June 13, 2019, and has been enforced since that date.  Accordingly, children attending year-round or summer day care or private, public, or parochial schools and previously had a non-medical exemption to the immunization requirement were required to receive their first dose of each immunization series by June 28, 2019, and parents of such children were required to show by July 14, 2019 that they had made appointments for required age-appropriate follow-up doses in accordance with the Advisory

Committee on Immunization Practices immunization schedule. *Id.* The deadline for children attending school beginning in the fall of 2019 to receive the first dose is fourteen days after the first day of school. *Id.* Within 30 days after the first day of school, parents must show that they have made the required follow-up appointments. *Id.*

While the Legislature could have taken this action regardless, *see* Point I, *infra*, public health concerns motivated the recent amendment to PHL § 2164, as explained in the New York State Senate Introducer's Memorandum ("Senate Memo"). Ex. B to Matthews Decl. (Senate Memo). The Senate Memo also cites United States Supreme Court and Second Circuit precedent upholding vaccination requirements over religious objections, including the Supreme Court's holding that "the right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." *Id.* (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944)). The New York State Assembly Introducer's Memorandum ("Assembly Memo") provided a similar justification for the amendment. Ex. C to Matthews Decl. (Assembly Memo).

Upon signing the legislation, Governor Cuomo stated: "While I understand and respect freedom of religion, our first job is to protect the public health and by signing this measure into law, we will help prevent further transmissions and stop this outbreak right in its tracks." Ex. D to Matthews Decl. (Governor Andrew Cuomo's June 13, 2019 Press Release).

**D.    The Individuals with Disabilities Education Act**

IDEA is comprehensive legislation that provides federal funding to states that develop plans to ensure a "free appropriate public education" ("FAPE") to "all children with disabilities." *See* 20 U.S.C. § 1412(a)(1)(A). Originally signed into law in 1990, IDEA was most recently amended and reauthorized in 2004 by the Individuals with Disabilities Education Improvement

Act of 2004 ("IDEA 2004"). Pub. L. No. 108-446. In providing funding to states, IDEA fulfills

its purpose, which, as set forth in the statute, is:

> (A) to ensure that all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;
> (B) to ensure that the rights of children with disabilities and parents of such children are protected; and
> (C) to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities[.]

*See* 20 U.S.C. § 1400(d). FAPE is defined as "special education and related services"

that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under [IDEA].

*See* 20 U.S.C. § 1401(9). Responsibilities under IDEA are divided between local

educational agencies ("LEAs"), generally local school districts, which are typically the direct

providers of special education programs and services, *see* 20 U.S.C. § 1413(a)(1), and state

educational agencies ("SEAs"), such as SED, which are given general supervisory authority, *see*

20 U.S.C. § 1412(a)(11)(A). New York State receives federal funds under IDEA, and has

enacted statutory and regulatory provisions to meet its obligations under federal law regarding

the education of students with disabilities. *See* N.Y. Educ. Law § 4401, *et seq.*; 8 N.Y.C.R.R. §

200.1, *et seq.*

## 1. *SED's Role in Administering IDEA*

IDEA accords state educational agencies such as SED a general supervisory role to

ensure that the requirements of IDEA are met, *see* 20 U.S.C. § 1412(a)(11)(A)(i), and that "all

educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency" "meet the educational standards of the State educational agency." *See* 20 U.S.C. § 1412(a)(11)(A)(ii)(II).  Consistent with the state educational agency's supervisory role, in order to receive funds under IDEA, each local school district is required to demonstrate to the satisfaction of SED that it provides for the education of students with disabilities within its jurisdiction, and has in place policies, procedures, and programs that are consistent with state standards, policies, and procedures established under 20 U.S.C. § 1412.  *See* 20 U.S.C. § 1413(a)(1).

State educational agencies are required to monitor implementation of IDEA by local school districts, *see* 20 U.S.C. § 1416(a)(1)(C)(i), and to examine "quantifiable indicators" in three specified "priority areas."  *See* 20 U.S.C. § 1416(a)(3).  The performance of the respective state and local educational agencies in these priority areas are further monitored by the U.S. Secretary of Education.  *Id.*

## 2. *The Development of Individual Education Programs and the Assurance of a Free Appropriate Public Education*

In New York, local school districts are required to review, and, if appropriate revise, at least once a year, an Individualized Education Program ("IEP") for each student with a disability residing in their jurisdiction.  *See* 8 N.Y.C.R.R. § 200.4(d)(2); *see also* 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a).  The IEP – an annual statement of the student's present levels of education performance, the measurable annual goals for the advancement of the student's level of education performance, and the special education program and services to be provided to the student to meet those goals, 20 U.S.C. § 1414(d)(1)(A); 8 N.Y.C.R.R. § 200.4(d)(2) – is the "'centerpiece' of IDEA's education delivery system." *See R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (quoting *Murphy v. Arlington Cent. Sch. Dist.*,

297 F.3d 195, 197 (2d Cir. 2002)).  IEPs are not required to "furnish[] …every special service necessary to maximize each handicapped child's potential."  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 199 (1982).  Rather, IDEA requires that IEPs provide a "basic floor of opportunity," consisting of services that are "individually designed to provide educational benefit" to a child with a disability.  *Id.* at 201.  More recently, the Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement."  *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. __, 137 S. Ct. 988, 999 (2017).

New York state law assigns responsibility for developing IEPs to the relevant Committee on Special Education ("CSE"), which each school district is required to establish; the CSE fulfills the function of the "IEP Team" under IDEA.  *See* N.Y. Educ. Law § 4402(1)(b)(1); 20 U.S.C. § 1414(d)(1)(B).

### 3.  *Procedural Safeguards and New York's Two Tiered Due Process System*

As a recipient of federal funds under IDEA, New York State and the local school districts are required to "establish and maintain procedures in accordance with" IDEA "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of [FAPE] by such agencies."  *See* 20 U.S.C. § 1415(a).  Upon a district's receipt of a parental complaint regarding services or the placement of a student with a disability, and prior to the initiation of the due process hearing, unless otherwise waived, the local school district is required to convene a meeting with the parent and relevant members of the CSE to discuss the complaint and provide the school district an opportunity to resolve the complaint. *See* 20 U.S.C. § 1415(f)(1)(B); 8 N.Y.C.R.R. § 200.5(j)(2).

If not resolved through the resolution process or by other means such as mediation, *see*

N.Y. Educ. Law § 4404-a, the parents and school district will proceed to an "impartial due process hearing," 20 U.S.C. § 1415(f), before an impartial hearing officer ("IHO").  *See* N.Y. Educ. Law § 4404(1).  The decision of an IHO may be appealed to a state review officer ("SRO") employed by SED.  *See* N.Y. Educ. Law § 4404(2); 20 U.S.C. § 1415(g).  The SRO's decision may in turn be challenged in a proceeding or suit brought by the parent against the LEA in either state court under Article 4 of the New York Civil Practice Law and Rules or in federal court.  *See* N.Y. Educ. Law § 4404(3)(a); 20 U.S.C. § 1415(i)(2)(A).

   *4.  Students with Disabilities in Nonpublic School Settings in New York State*

   IDEA is silent as to the question of services to home schooled students and does not require states to provide special education services to such students; the U.S. Department of Education has explained that home schooling should be treated just like any other private placement under IDEA *if the State recognizes home schools as nonpublic school placements*, which New York does for special education purposes.  *See*, *e.g.*, 71 Fed. Reg. 46,540, 46,594 (Aug. 14, 2006); N.Y. Educ. Law § 3602-c (2-c).  For the purposes of special education, New York recognizes home schooled students as nonpublic school students and therefore students with disabilities who are home schooled are eligible to receive special education services from their school district of residence on an equitable basis.  Ex. E to Matthews Decl. (SED's July 2008 Memorandum Regarding New Requirements for the Provision of Special Education Services to Home-Instructed ("Home-Schooled") Students ("DeLorenzo Memo")); 20 U.S.C. §1412 (a)(10); 34 CFR §300.137; N.Y. Educ. Law § 3602-c (2-c).  New York is unique in that it defines "services provided on an equitable basis" as services provided in the same manner as compared to other students with disabilities attending public or nonpublic schools located within the school district.  which it is required to provide to students attending nonpublic schools,  those

who are home schooled, as services provided in the same manner as compared to other students

with disabilities attending public or nonpublic schools located within the school district.  Ex. E to

Matthews Decl. (DeLorenzo Memo);[3] N.Y. Educ. Law § 3602-c (2-c).

In New York State, a parent may annually provide written notice of the intent to educate

their child at home to the superintendent of schools of their local school district.  8 N.Y.C.R.R.

§100.10.  The school district then sends the parent a copy of the relevant regulations and an

Individualized Home Instruction Plan ("IHIP") form template.  *Id*. at (c)(1).[4]  The parent submits

the IHIP to the school district and then the district determines whether the IHIP complies with

the regulatory requirements contained in 8 N.Y.C.R.R. 100.10(d) and (e).  If it does not, the

parent has the opportunity to correct and submit a revised IHIP and, if necessary, contest the

determination of noncompliance.  *Id*. at (c)(2)-(5).  Ultimately, parents have the right to appeal a

final school district's determination of noncompliance to the Commissioner.  *Id*. at (c)(6).

When the parent of a student with a disability decides to home school a child, the parent

submits an IHIP, as described above, and can also request special education services in writing to

the local school district's board of education.  Ex. E to Matthews Decl. (DeLorenzo Memo).

Then, after the IHIP is in place, the CSE develops an Individualized Education Services Program

("IESP") for the student.  The IESP is developed by the CSE in the same manner as an IEP, *see*

pp. 9-10, *supra*, includes the same contents, and takes into consideration the parents' decision to

home school their child.  *Id*.  Parents of home schooled students who disagree with the CSE's

IESP recommendations are entitled to the procedural safeguards contained in N.Y. Educ. Law

---

[3] The DeLorenzo Memo is also available at:
http://www.p12.nysed.gov/sss/homeinstruction/homeinstructionguidance708.html.

[4] The Defendants respectfully refer the Court to 8 N.Y.C.R.R. 100.10 which more fully sets forth the relevant
timeline and the specific requirements of an IHIP.

4404 and 20 U.S.C. § 1415 just the same as parents of nonpublic school students and public school students. *Id*.

### E. Procedural History

Plaintiffs filed the instant action on July 25, 2019, challenging PHL § 2164 on the alleged ground that it is preempted by IDEA. On August 5, 2019, Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin the enforcement of PHL § 2164 as against students with disabilities; to restore the rights of Plaintiffs and students with disabilities under the former PHL § 2164; and to provide notice to disabled children and their families.

## PRELIMINARY INJUNCTION STANDARD

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies." *N.M. v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 256-57 (E.D.N.Y. 2016) (internal quotations omitted). As the Supreme Court stated in *Winter v. Natural Resources Defense Counsel*, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." 555 U.S. 7, 24 (2008); *see also Weinstein v. Krumpter*, 120 F. Supp. 3d 289 (E.D.N.Y. 2015). The party seeking a preliminary injunction must establish "(a) irreparable harm *and* (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) *(*quoting *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.,* 660 F.3d 643, 648 (2d Cir. 2011)) (emphasis added).[5]

---

[5] Courts refer to preliminary injunctions as either prohibitory injunctions, which maintain the status quo pending resolution of the case, or mandatory injunctions, which alter the status quo. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). Defendants disagree with Plaintiffs' contention that the "status quo" here is the pre-June 13, 2019 PHL § 2164, without the amendment repealing the religious exemption. However, the distinction is irrelevant here, because Plaintiffs must demonstrate a likelihood of success on the merits, which they cannot do.

However, where, as here, a case involves "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," a plaintiff cannot rely on the "fair-ground-for-litigation" alternative. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir. 1989) (internal citations omitted)). The Second Circuit has espoused that such an exception "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Otoe-Missouria Tribe*, 769 F.3d at 110 (quoting *Able v. United States,* 44 F.3d 128, 131 (2d Cir. 1995)). Further, where a party seeks to enjoin legislation developed through the "presumptively reasoned democratic processes," a party must demonstrate a *likelihood* of success on the merits, rather than only a probability of success. *Olson v. Wing*, 281 F. Supp. 2d 476, 485 (E.D.N.Y.), *aff'd*, 66 F. App'x 275 (2d Cir. 2003) (citing *Able v. U.S.*, 44 F.3d 128, 131 (2d Cir. 1995) (emphasis added). This heightened requirement again reflects the fundamental principle that courts should defer to government policies implemented through the democratic process. *Olson*, 281 F. Supp. 2d at 485 (quoting *Karmel v. City of New York*, 200 F. Supp. 2d 361, 365 (S.D.N.Y. 2002)).

In sum, where, as here, a party seeks an injunction against government action taken in the public interest pursuant to a valid statutory scheme, they must demonstrate (1) a likelihood of success on the merits of the underlying claim, (2) irreparable harm absent injunctive relief, and (3) that the public interest weighs in favor of granting the injunction. *See Pope v. Cnty. of Albany*, 687 F.3d 565, 570 (2d Cir. 2012); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016). As demonstrated herein, Plaintiffs cannot satisfy their burden with respect to any of the essential criteria for a preliminary injunction, and

therefore the Court should deny Plaintiffs' motion.

# ARGUMENT

## POINT I

### ALTHOUGH STYLED AS AN IDEA PREEMPTION CLAIM, PLAINTIFFS ARE FUNDAMENTALLY ARGUING THAT THEY SHOULD BE ALLOWED A RELIGIOUS EXEMPTION TO THE STATE'S MANDATORY VACCINATION REQUIREMENT, AN ARGUMENT WHICH COURTS HAVE REPEATEDLY REJECTED.

Plaintiffs cannot succeed on the merits of their claim, because mandatory vaccination laws, including PHL § 2164, have repeatedly been held constitutional. Although framed as an IDEA Supremacy Clause challenge, Plaintiffs' claim that they should not be subject to PHL § 2164 is fundamentally a claim that they should be entitled to a non-medical exemption to the mandatory vaccination requirement. They are not so entitled.

Plaintiffs' claim is simple: Plaintiffs argue that their children, who are students with disabilities and eligible for special education services, should be exempted from complying with PHL § 2164 because they have religious objections to vaccinations. *See, e.g.,* Plaintiffs' Memorandum of Law in Support of Motion for a Preliminary Injunction ("Pl. Mem.") at 16; Declaration of V.D. at ¶ 9; Declaration of T.S. at ¶ 8; Declaration of S.K. at ¶ 8; Declaration of P.E.T. at ¶ 8; Declaration of B.H. at ¶ 8. Because of Plaintiffs choice not to vaccinate their children, their children are now unable to attend public or private school in New York State and will presumably have to be home schooled, at which point they will still be eligible for special education services. N.Y. Educ. Law. § 3205; §3602-c (2-c); PHL § 2164. However, Plaintiffs argue here that they should be exempt from complying with PHL § 2164 because they find home schooling unsatisfactory. *See, e.g.,* Pl. Mem. at 4, 17, 21, 23, 35. Therefore, Plaintiffs' argument that they should not be required to comply with PHL § 2164 is in fact an argument that they be exempt from the mandatory vaccination law based on a religious objection. The law is well

settled that Plaintiffs have no right to such an exemption.

The New York Court of Appeals has long held that statutes excluding unvaccinated children from public schools are constitutional. *See Viemester v. White*, 179 N.Y. 235, 241–42 (1904). The *Viemeister* court explained that the law "operate[d] impartially upon all children in the public schools, and [was] designed, not only for their protection, but for the protection of all the people of the state." *Id*. at 241. The Court concluded that "[n]o right conferred or secured by the Constitution was violated by that law, or by the action of the school authorities based thereon. *Id*. at 241-42; *see also Fosmire v. Nicoleau*, 75 N.Y.2d 218, 226 (1990) ("There is no question that the State can adopt compulsory vaccination laws to protect the public from the spread of disease.").

Beyond New York State, the United States Supreme Court has also long held that parents' rights to raise children in accordance with their personal and religious beliefs generally must yield to broader public health objectives when the health of children is at risk or when there is a recognized threat to public safety. In *Prince v. Massachusetts*, the Supreme Court held that "[t]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death," and the Court cited compulsory vaccinations as an example of permissible legal restrictions on the exercise of religion. 321 U.S. 158, 166 (1944); *see also Employment Div., Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 889 (1990) (holding "compulsory vaccination laws" need not be justified by a "compelling state interest" even if they adversely affected the practice of religion).

Relying on this precedent, the Second Circuit and its District Courts have explicitly rejected challenges to compulsory vaccination laws. In *Phillips v. City of New York*, the Second Circuit rejected the plaintiffs' claim that their unvaccinated children's temporary exclusion from

16

school during a vaccine-preventable disease outbreak unconstitutionally burdened their free exercise of religion. 775 F.3d 538, 540 (2d Cir. 2015). The court, applying rational basis review, held that "mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause." *Id*. at 543. ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." (internal quotations omitted)). Implicitly holding that New York need not maintain a non-medical exemption to the mandatory vaccination requirement *at all*, the Second Circuit reasoned that "New York could constitutionally require that all children be vaccinated in order to attend public school….Because the State could bar [plaintiffs'] children from school altogether, *a fortiori*, the State's more limited exclusion during an outbreak of a vaccine-preventable disease is clearly constitutional." *Id*.

Numerous courts have agreed with the holding in *Phillips* upholding compulsory vaccination legislation. *See, e.g., Watkins-El v. Dep't of Educ*., 2016 WL 5867048, at *3 (E.D.N.Y. Oct. 6, 2016) ("The Second Circuit has explicitly held that the immunization requirements of Public Health Law § 2164 violate neither the Free Exercise Clause of the First Amendment nor the Due Process clause of the Fourteenth Amendment." (citing *Phillips*, 775 F.3d 538)); *Caviezel v. Great Neck Public Schools*, 739 F. Supp. 2d 273, 285 (E.D.N.Y. 2010) ("[T]he Court finds that the free exercise clause of the First Amendment does not provide a right for religious objectors to be exempt from New York's compulsory inoculation law."), *aff'd,* 500 Fed. App'x 16 (2d Cir. 2012); *Sherr v. Northport–East Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 88 (E.D.N.Y. 1987) ("[I]t has been settled law for many years that claims of religious freedom must give way in the face of the compelling interest of society in fighting the spread of contagious diseases through mandatory inoculation programs").

Thus, although Plaintiffs avoid explicitly arguing that the instant case is a challenge to the repeal of the religious exemption itself, presumably because courts have repeatedly rejected that contention, the instant action, at its core, is such an argument, and as such, must be rejected.

## POINT II

### PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR PREEMPTION CLAIMS.

Plaintiffs' motion for a preliminary injunction should be denied because they have not demonstrated a likelihood of success on the merits. *N.M. v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 257 (E.D.N.Y. 2016) (denying preliminary injunction despite evidence of irreparable harm where plaintiffs failed to sustain their burden of showing a likelihood of succeeding on the merits of their claims). Because Plaintiffs cannot demonstrate, *inter alia*, that it is impossible to comply with both IDEA and PHL § 2164, Plaintiffs cannot sustain their burden and demonstrate that they are entitled to a preliminary injunction.

### A.     IDEA DOES NOT PREEMPT N.Y. PUB. HEALTH LAW § 2164.

Plaintiffs' claim that IDEA preempts PHL § 2164, as amended on June 13, 2019, fails because they cannot demonstrate that the state and federal law are irreconcilable. Consistent with the Supremacy Clause of the United States Constitution, "state laws that conflict with federal law are 'without effect.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)); *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) ("New York SMSA"); *see also* U.S. Const. Art. VI, cl. 2. Yet, there is a "presumption against preemption" and the analysis begins "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) (modifications omitted)).

In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law"; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives. *New York SMSA*, 612 F.3d at 104 (citing *Wachovia Bank, N.A. v. Burke,* 414 F.3d 305, 313 (2d Cir. 2005) and *English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79 (1990)).

Because courts presume that Congress "does not cavalierly pre-empt state-law causes of action," *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quoting *Medtronic*, 518 U.S. at 485), the party asserting that federal law preempts state law bears the burden of establishing preemption. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 725 F.3d 65, 96 (2d Cir. 2013); *Marentette*, 886 F.3d at 117. Moreover, the presumption *against* preemption is "particularly strong when Congress legislates in a field traditionally occupied by states[,]" *Marentette*, 886 F.3d at 117 (citing *Wyeth*, 555 U.S. at 565); *In re MTBE*, 725 F.3d at 96). Therefore, in those circumstances, a court should only find that federal law preempts state law where "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Marentette*, 886 F.3d at 117 (quoting *In re MTBE*, 725 F.3d at 102).

None of the recognized preemption principles applies here. As an initial matter, because IDEA lacks a preemption provision and specifically provides a role to states for the provision of special education services, there can be no valid argument that either express or field preemption applies.[6] *E. Ramapo Cent. Sch. Dist. v. DeLorenzo*, 2013 WL 5508392, at *8 (S.D.N.Y. Oct. 3,

---

[6] Plaintiffs indicate in their papers that they are not arguing preemption based on the express or field principles. *See*, *e.g.*, Pl. Mem. at 26.

2013).  Therefore, the only question here is whether conflict preemption applies and, for the reasons established herein, it does not.

A conflict has preemptive effect in only two instances, neither of which are present in this case.  First, when compliance with both federal and state regulations is a physical impossibility, and second, when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  *E. Ramapo Cent. Sch. Dist.*, 2013 WL 5508392 at *8 (quoting *In re MTBE,* 725 F.3d at 97).  This second instance is referred to as "obstacle preemption."  *Ulysse v. AAR Aircraft Component Servs.*, 841 F. Supp. 2d 659, 667 (E.D.N.Y. 2012) (internal citations and quotations omitted).  Contrary to Plaintiffs' assertions, PHL § 2164 does not irreconcilably conflict with IDEA nor does it frustrate IDEA's purpose and objectives.  *Ulysse*, 841 F. Supp. 2d at 667 ("State law is in 'irreconcilable conflict' with federal law, and hence preempted by federal law, when compliance with the state statute would frustrate the purposes of the federal scheme.") (internal quotations omitted).

IDEA does not preempt PHL § 2164 because it is clearly feasible to comply with both statutes.  Parents can choose to either vaccinate their children and send them to public, private, or parochial school or choose not to vaccinate their children and home school them, where they are still eligible for special education services.  Simply because the amendment of PHL § 2164 affects those students with disabilities who previously had religious exemptions – indeed it affects *all* students who previously had religious exemptions – does not mean that those children are now unable to comply with the public health law.[7]  Plaintiffs have a "heavy" burden in trying to establish preemption and the "mere fact of 'tension' between federal and state law is generally

---

[7] To the extent Plaintiffs are arguing that their right to attend public school as an unvaccinated student trumps the public's interest in mandatory vaccination, that argument has been addressed and rejected by the courts.  *See* Point I, *supra*.

not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *In re MTBE*, 725 F.3d at 101–02 (quoting *Madeira v. Affordable Hous. Found., Inc.,* 469 F.3d 219, 241 (2d Cir. 2006)); *see also infra* pp. 26-27.

Plaintiffs erroneously claim that PHL § 2164, as amended, "excludes disabled children from attending all schools, public or private[]" and "serves as a bar to students with disabilities attending school[,]" Pl. Mem. at 1, 26. But PHL § 2164 does not bar students with disabilities from attending school; it bars *unvaccinated* children from attending school. This mischaracterization underlies Plaintiffs' entire motion. Indeed, it exposes the fact that Plaintiffs conflate their affirmative choice not to vaccinate their children for non-medical reasons with an inability to comply with a validly enacted public health statute. The June 13, 2019 amendment repealing the non-medical exemption to New York's vaccination requirement applies to *every* student, in *every* educational setting, and provides only a narrow exception for children who qualify for an exemption based on medical necessity. PHL § 2164. Plaintiffs' children and other students with disabilities are not singled out.

Plaintiffs' affirmative choice not to vaccinate their children is an affirmative choice to opt out of public or private school in New York State. Plaintiffs, of course, are well within their right to do so and Plaintiffs will be entitled to receive special education services as home schooled students as explained above and again addressed below. However, that is a decision made by Plaintiffs. It is not, as they would have the Court believe, an inability to comply with the public health law and IDEA. Finally, as explained in Point I, *supra*, Plaintiffs are not entitled to a religious exemption to the vaccination requirement.

**B.     NEW YORK STATE PROVIDES SPECIAL EDUCATION SERVICES TO STUDENTS WITH DISABILITIES WHO ARE HOME SCHOOLED.**

Plaintiffs' motion incorrectly asserts that their choice not to vaccinate renders their children without access to special education services.  Contrary to this assertion, New York state law deems all nonpublic school students, including those who are home schooled, as eligible for special education services.  *See* N.Y. Educ. Law 3602-c; 3602-c (2-c).  IDEA does not require states to provide special education services to students who are home schooled, but rather leaves that decision to the individual states.  The U.S. Department of Education charges that home schooling should be treated just like any other private placement under IDEA *if the State recognizes home schools as nonpublic school placements*, which New York does for the provision of special education programs and services.  *See*, *e.g.*, 71 Fed. Reg. 46,540; 46,594 (Aug. 14, 2006); N.Y. Educ. Law § 3602-c (2-c).

Plaintiffs allege that home schooling is "unworkable" for them.  Pl. Mem. at 4.  Plaintiffs also allege, without support, that they are opposed to home schooling because the services at home would not be "remotely comparable" to those in public school.  Pl. Mem. at 17.  Plaintiffs may *prefer* that their children attend public school, but it is solely their decision to adhere to their non-medically based objection to the mandatory vaccination law that makes their children's public school attendance impossible.  Parents regularly make choices about their children's education and this choice is no different.  However, contrary to Plaintiffs' claim that, if home schooled, their children will have no "previously agreed-upon educational and related services[,]" Pl. Mem. at 35, as described above, if Plaintiffs choose to be home schooled, they are entitled to submit an IHIP and then receive an IESP, which is developed in the same manner as an IEP, includes the same contents, and takes into consideration the parents' decision to home school their child.  *See* pp. 6-7, *supra*; N.Y. Educ. Law 3602-c (2-c).  Services must be provided

on an equitable basis as compared to other students with disabilities attending public or nonpublic schools located within the school district. Ex. E to Matthews Decl. (DeLorenzo Memo); N.Y. Educ. Law 3602-c(2-c). Plaintiffs will be provided with that equitable access, consistent with PHL § 2164, which applies to all students. Thus, compliance with IDEA is feasible in conjunction with PHL § 2164.

Also, while Plaintiffs contend that their children may not be able to receive a FAPE in the least restrictive environment, Pl. Mem. at 29, that requirement is "not absolute" and "determining whether a student has been placed in the 'least restrictive environment' requires a flexible, fact-specific analysis." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) (quoting *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir. 2008). As with any educational placement, the student's individual circumstances will inform the meaning of the "least restrictive environment." As described above, *see* pp. 9-10, 12-13, *supra*, the CSE develops an IESP in the same manner as an IEP, includes the same contents, and takes into consideration the parents' decision to home school their child. Ex. E to Matthews Decl. (DeLorenzo Memo).

Further, Plaintiffs' reliance on California's repeal of its religious exemption to mandatory vaccination is misplaced. Pl. Mem. at 9-10. California's law, which has been interpreted by some as allowing students with disabilities to attend public school, even if they are unvaccinated and do not have a medical exemption, has no bearing on Plaintiffs' preemption argument.[8] There was no adjudication or judicial determination on California's law, and thus, there is no

---

[8] Moreover, California Health and Safety Code, section 120335, subdivision (h), states: "This section does not prohibit a pupil who qualifies for an individualized education program, pursuant to federal law and Section 56026 of the Education Code, from accessing 2 any special education and related services required by his or her individualized education program[]" and counties are interpreting this provision in different ways, creating confusion. PHL § 2164 does not contain such language.

legal basis for Plaintiffs' reliance on it. New York State amended PHL § 2164 based on its own reasoning and public health crisis, not those of the California legislature. Regardless of California's determination, because New York state law deems home schooled students eligible for special education services, the amendment to PHL § 2164 does not terminate students with disabilities' access to services if they are home schooled.

Accordingly, PHL § 2164 is not in conflict with IDEA, and Plaintiffs cannot succeed on their preemption claim.

### C. IDEA'S SILENCE REGARDING MANDATORY VACCINATION DOES NOT MEAN IDEA PREEMPTS A STATE PUBLIC HEALTH LAW REQUIRING IT.

The mere fact that IDEA, a federal special education statute, does not contain a provision concerning immunization requirements for students attending public school, an area governed at the state and local level, does not establish that it preempts PHL § 2164, a state public health law. Yet Plaintiffs argue that because IDEA neither "require[s] children to be vaccinated to access their federally protected rights to FAPE in the "least restrictive environment" nor "permit[s] permanent exclusion and deprivation of the benefit …if children are not fully vaccinated in accordance with, as here, a contrary state law." IDEA's silence on vaccinations is inapposite. Taken to its logical conclusion, Plaintiffs would have this Court find that any law requiring vaccination is preempted. Pl. Mem. at 29. That cannot be the case.

The parties agree on IDEA's purpose, as set forth in 20 U.S.C. § 1400(d), to provide states with funding and assistance in ensuring that LEAs provide to students with disabilities a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living, and that the rights of these children and their parents are protected. PHL § 2164 does not conflict with that purpose

in any way.

As a preliminary matter, *IDEA is not a public health law*.  It is comprehensive legislation which aims to provide states with funding and assistance to ensure that LEAs provide a FAPE to students with disabilities, a goal well outside the realm of public health law.  In contrast, PHL § 2164 is a generally applicable statute with which every student enrolled in public, private, or parochial school in New York State must comply, unless medically unable to do so, and there is no distinction made for *any* category of students, including students with disabilities.  These two laws address different objectives and a "showing that the federal and state laws serve different purposes cuts against a finding of obstacle preemption."  *In re MTBE*, 725 F.3d at 101.

Further, "[i]t has long fallen within the province of states to safeguard the health and safety of their citizens." *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 86 (2d Cir. 2006) (citing *Medtronic v. Lohr*, 518 U.S. 470, 475 (1996)).  Similarly, public education has always been, and continues to be, the domain of state and local governments – a fact acknowledged by Plaintiffs in their papers.  *See* Pl. Mem. at 31.  The Supreme Court has consistently held that public education is a matter best handled locally; it is decidedly *not* the domain of the federal government.  *See*, *e.g.*, *Edwards v. Aguillard,* 107 S. Ct. 2573, 2577 (1987) (states and local school boards generally afforded considerable discretion); *Pico*, 457 U.S. at 863 (local school boards have broad discretion in managing school affairs); *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 507 (1969) (state and school boards can prescribe and control conduct in the schools within constitutional boundaries); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (public education by and large is committed to the control of state and local authorities); *see also Patrick v. Success Acad. Charter Sch., Inc.*, 354 F. Supp. 3d 185, 212 (E.D.N.Y. 2018).  This means that individual states, using their police power, make determinations about public education

including, for example, enrollment requirements.

In such situations, there is no preemption. "The key to the preemption inquiry is the intent of Congress. Congress may manifest its intent to preempt state or local law explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (citing *Altria*, 555 U.S. at 76). The Supreme Court has explained that:

> in all pre-emption cases, and particularly those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth*, 555 U.S. at 565 (internal quotations, citations, and alterations omitted). Courts "have a duty to accept the reading that disfavors pre-emption" when such a reading is plausible. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005); *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518 (1992) (the presumption against the preemption of state police power regulations "reinforces the appropriateness of a narrow reading" of federal provisions); *In re MTBE*, 725 F.3d at 101–02 (the "mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power.") (quoting *Madeira v. Affordable Hous. Found., Inc.,* 469 F.3d 219, 241 (2d Cir. 2006)).

Here, a federal education statute does not supersede the State's separate public health law. This is especially true where not only are the two statutes unrelated, but the federal statute itself contemplates substantial state involvement. Specifically, IDEA adopts an approach termed "cooperative federalism" with respect to the individual states, meaning that IDEA "'incorporates state substantive standards as the governing federal rule' if they are consistent with the federal scheme and meet the minimum requirements set forth by the IDEA." *Taylor v. Vermont Dep't of*

*Educ.*, 313 F.3d 768, 777 (2d Cir. 2002) (quoting *Mrs. C. v. Wheaton,* 916 F.2d 69, 73 (2d Cir.1990) and citing *Antkowiak v. Ambach,* 838 F.2d 635, 641 (2d Cir.1988) (same)); *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005); *Bryant v. New York State Educ. Dep't,* 692 F.3d 202, 213-214 (2d Cir. 2012); *Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 733 (2d Cir. 2007); 20 U.S.C. § 1412.  "Cooperative federalism" is premised on the idea that IDEA "does not usurp the state's traditional role in setting educational policy…[r]ather, it is left to the individual states to determine how to implement the statute's goals."  *Taylor*, 313 F.3d at 777 (finding that "[g]iven the nature of the statutory scheme, we look to state law to fill [the] gap" in defining the term "parent" and determining parental rights under IDEA); *see also Burlington v. Dep't of Educ.,* 736 F.2d 773, 784 (1st Cir. 1984) ("'Cooperative federalism' in this context, then, allows some substantive differentiation among the states in the determination of which educational theories, practices, and approaches will be utilized for educating disabled children with a given impairment.").  The Second Circuit held in *Taylor* that it "seems plain that the Congress drew the procedural and substantive contours of education for [students with disabilities], but left the shading and tinting of the details largely to the states. States are responsible for filling in the numerous interstices within the federal Act through their own statutes and regulations." *Taylor*, 313 F.3d at 777 (quoting *Burlington,* 736 F.2d at 785).

Relatedly, Plaintiffs are correct that states may implement laws and regulations which exceed the protections afforded by IDEA, but they erroneously assume that PHL § 2164 is analogous to a state special education statute or an IDEA implementing regulation.  While IDEA requires participating states to establish a "basic floor of meaningful, beneficial educational opportunity," states may exceed the federal floor and enact their own laws and regulations to guarantee a higher level of entitlement to students with disabilities.  *Bay Shore Union Free Sch.*

*Dist.*, 485 F.3d at 733–34 (citing *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 480 F.3d 138, 139 (2d Cir. 2007), amending 465 F.3d 503 (2d Cir. 2006)); *see also Burlington,* 736 F.2d at 792 (holding that "a state is free to exceed, both substantively and procedurally, the protection and services to be provided to its disabled children" under IDEA).

However, Plaintiffs' claim that PHL § 2164 is a "more burdensome limitation[] on access to FAPE" that falls below "the federal minimum" promised by IDEA is factually and legally erroneous. Pl. Mem. at 26. PHL § 2164 does not directly implicate any student's access to a FAPE. The cases to which Plaintiffs cite to support their argument that PHL § 2164 "falls below" the federal minimum afforded by IDEA are inapposite. For example, in *Evans*, the court found that an additional application and review process for certain students that resulted in a "substantial delay" of nearly 200 days between IEP development and placement directly violated the IDEA's explicit requirement that an IEP be implemented "as soon as possible" following an IEP meeting. *Evans v. Evans*, 818 F. Supp. 1215, 1221 (N.D. Ind. 1993). In *Weast*, the court found that a Maryland statute requiring parents give notice to the school district prior to enrolling a child in private school was in direct conflict with, and therefore preempted by, IDEA's notice of removal requirements. *Sarah M. v. Weast*, 111 F. Supp. 2d 695 (D. Md. 2000). However, those challenged requirements directly conflicted with the language of IDEA, and involved policies, procedures, or standards that were related to the provision of services, the procedural safeguards, and the like; in other words, all cases finding IDEA preemption implicate, *in some way*, IDEA's purpose, substance, or procedure. Plaintiffs fail to demonstrate how a generally applicable public health law is analogous to the cases above. Put simply, PHL § 2164 does not conflict with or contradict IDEA's provisions or purpose, and thus, it is not preempted. Therefore, Plaintiffs are unlikely to succeed on the merits, and their motion for a preliminary

injection should be denied.

**D.**    **PHL § 2164 DOES NOT, ON ITS OWN, TRIGGER IDEA'S PROCEDURAL SAFEGUARDS.**

Plaintiffs cannot succeed on their claim that PHL § 2164 has deprived them of certain procedural safeguards under the IDEA. *E.g.* Pl. Mem. at 14-16. Contrary to Plaintiffs' assertions, PHL § 2164 as amended does not trigger IDEA's procedural safeguards, including the pendency provision, because it was a change in state law that altered Plaintiff's educational placement options - a law applicable to every student in every educational setting – rather than a change in the placement of an individual student. In brief, IDEA and its federal and state implementing regulations guarantee procedural safeguards "*whenever the local educational agency* (A) proposes to initiate or change; or (B) refuses to initiate or change" a child's identification, evaluation, educational placement, or provision of FAPE. 20 U.S.C. § 1415(b)(3) (emphasis added); 34 C.F.R. § 300.503; 8 N.Y.C.R.R. § 200.5(a) ("Prior written notice…must be given to the parents of a student with a disability a reasonable time before the school district proposes to or refuses to initiate or change the identification, evaluation, educational placement of the student or the provision of a [FAPE]."). In other words, IDEA's procedural safeguards are triggered when the LEA proposes a change, or refuses to implement a requested change, affecting the student's placement or services.

There are also practical reasons that a change in state law does not trigger IDEA's procedural safeguards, the purpose of which is to ensure an LEA is appropriately providing students with disabilities with FAPE. First, no decisionmaker in the context of the administrative hearing process has the authority to override the state public health statute. Second, if each individual student across New York State were permitted to file a complaint with respect to PHL § 2164 and each individual student then had a due process hearing, the opportunity for disparate

29

results stemming from individual IHO and SRO decisions would be bedlam.  Plaintiffs even acknowledge the chaos that would result if all students were made to challenge this statute using the administrative hearing process prescribed by IDEA and its implementing regulations.  Pl. Mem. at 36.[9]

### 1.  *The Stay Put Provision is Inapplicable to Plaintiffs' Situation.*

Plaintiffs are not entitled to pendency – or to "stay put" as the provision is known more colloquially – because this injunction-like procedure is only available during the pendency of a proceeding conducted after the filing of due process complaint notice.  N.Y. Educ. Law § 4404 (4)(a)  As a preliminary matter, Plaintiffs misconstrue the holding of *Murphy*.  Pl. Mem. at 35, n. 2; *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199-200 (2d Cir. 2002). *Murphy* held that IDEA does not require a plaintiff to administratively exhaust his remedies *with respect to pendency*; however, a child must still have an administrative hearing process pending in order for the stay put provision to take effect.  In other words, as long as a child has filed a due process complaint following an LEA proposed action, he is automatically entitled to stay put while that complaint is pending; however, he cannot stay put in the absence of a due process complaint.  20 U.S.C. § 1415(j); *see also J.M. v. Dep't of Educ., State of Hawai'i*, 224 F. Supp. 3d 1071, 1093 (D. Haw. 2016), *aff'd sub nom. J.M. by & through Mandeville v. Matayoshi*, 729 F. App'x 585 (9th Cir. 2018), and *overruled on other grounds by R.E.B. v. State of Hawaii Dep't of Educ.*, 870 F.3d 1025 (9th Cir. 2017) (IDEA's stay-put provision states that, "*during the*

---

[9] The *Catanzano* case relied upon by Plaintiffs is inapposite.  First , that case was a class action which involved a "long and complex history…detail[ed] in numerous prior opinions of this Court and of the district court." *Catanzano v. Wing*, 277 F.3d 99, 102 (2d Cir. 2001).  Second, *Catanzano* dealt with state legislation that was directly in conflict with a federal statute.  Specifically, in the W.D.N.Y. case to which Plaintiffs specifically cite, the district court found that the relevant state statute "failed to provide for any notice or right to a hearing" and therefore violated the explicit language of the Medicaid Act, which required that states "must" provide a notice and hearing. *Catanzano by Catanzano v. Dowling*, 847 F. Supp. 1070, 1081, 1084 (W.D.N.Y. 1994).  Here, the New York State Education law has comprehensive provisions addressing procedural safeguards consistent with IDEA, which are not directly affected by PHL § 2164.

*pendency of any proceedings conducted pursuant to this section*, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child.") (emphasis added) (internal citations omitted).

Thus, the stay put provision applies "during the pendency of any proceedings" conducted pursuant to 20 U.S.C. § 1415 or N.Y. Educ. Law § 4404, and a child is legally entitled to stay put during the pendency of a due process hearing, appeal, and litigation. 20 U.S.C. § 1415(j); 34 C.F.R. § 300.507; 34 C.F.R. § 300.503. This lawsuit is not the result of a due process hearing request and, for the reasons explained above, the procedural safeguards are not triggered by Plaintiffs' circumstances here because the altered educational options resulting from the amendment of PHL §2164 are not changes in placement that are initiated or refused by the LEA, as contemplated by IDEA.

Further, Plaintiffs do not, and cannot, refute the general rule that the "stay put" provision is not applicable when the change is a result of a general policy decision and not a decision pertaining to an individual student. *See*, *e.g.*, *N.D. ex rel. Parents Acting as Guardians Ad Litem v. Haw. Dep't of Educ.,* 600 F.3d 1104, 1117 (9th Cir. 2010) (state implementation of furloughs that closed schools on Fridays was a state-wide administrative decision that did not constitute a change in placement triggering the "stay put" provision); *Weil v. Bd. of Elementary & Secondary Educ.,* 931 F.2d 1069, 1073 (5th Cir. 1991) (noting that "if the change in 'educational placement' is necessitated by the closure of a facility for reasons beyond the control of the public agency, the 'stay-put' provisions ... do not apply"); *DeLeon v. Susquehanna Cmty. Sch. Dist.,* 747 F.2d 149, 153, 153 n. 8 (3d Cir. 1984); *but see D.M. v. New Jersey Dep't of Educ.*, 801 F.3d 205 (3d Cir. 2015). Indeed, *R.B.*, which Plaintiffs' cite in their brief, involved *individual* claims of pendency during the adjudication of due process complaints. *See*, *e.g.*, *R.B. v. Mastery Charter School*,

532 Fed. App'x. 136 (3d Cir. 2013) (upholding an individual student's claim for a stay-put order granted during the resolution of a due process complaint based on the student's disenrollment).[10] Plaintiffs concede in their papers that the instant case "is not a situation where an aggrieved parent has a dispute over a child's IEP placement,…related services etc.," and therefore where the requirement of fact-specific determinations to be evaluated by administrative hearing officers with expertise on such issues would be helpful." Pl. Memo. at 35. This concession undermines Plaintiffs' pendency claim.

Finally, as a practical matter, it is unclear what Plaintiffs hope to achieve by pendency, as under the current law, their children are not eligible to attend public school unless they receive their immunizations or obtain an approved medical exemption. As discussed above, they cannot demonstrate a likelihood of success on the merits in this action. Nor does an IHO have the authority to overrule the public health law, which was validly enacted and amended through the democratic process and is constitutional, and order Plaintiffs' children to be enrolled into a public or private school in violation of PHL § 2164. Therefore, Plaintiffs are not entitled to stay put in their current educational placements, unless they receive their vaccinations in accordance with state law. They are, however, entitled to the procedural safeguards contained in N.Y. Educ. Law § 4404 and 20 U.S.C. § 1415 if they disagree with the CSE's IESP recommendations. Ex. E to Mathews Decl. (DeLorenzo Memo).

For all of the reasons above, Plaintiffs are not entitled to pendency.

---

[10] Plaintiffs claim that PHL § 2164, as amended, "has banned all disabled children from school" is, for all of the reasons already discussed, erroneous. Pl. Mem. at 35. The vast majority of students with disabilities are unaffected by the amendment to PHL § 2164; the *only* students with disabilities affected by the amendment are those *with religious objections to vaccination*, which now prevents them from attending public school. As discussed herein, Plaintiffs are not entitled to a religious exemption to the mandatory vaccination requirement.

## 2. *Plaintiffs Do Not Allege Systemic IDEA Claims.*

To the extent Plaintiffs are attempting to claim that they are alleging systemic IDEA violations in this action, Pl. Mem. 35-36, such claims fail for two main reasons. First, "systemic violations" pertain to circumstances where a school completely fails to implement the procedures set forth in IDEA or where a plaintiff alleges "wrongdoing that is inherent in the program itself and not directed at any individual child"; in those limited circumstances, a court may excuse IDEA's exhaustion requirement because "individual administrative remedies would be insufficient to address the defendants' failure to provide the services required by the IDEA." *See, e.g., Handberry v. Thompson,* 446 F.3d 335, 344 (2d Cir. 2006) (citing *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 112 (2d Cir. 2004)). In those limited circumstances alleging a district's systemic failure to provide FAPE, courts have found that an SEA may be named as a defendant in such suits because of the SEA's general supervisory and monitoring obligations under IDEA. *See*, *e.g.*, *J.S.,* 386 F.3d at 113 (excusing exhaustion where plaintiff alleged systemic violations, including: failure to perform timely evaluations and reevaluations of disabled children; failure to provide parents with required procedural safeguards regarding identification, evaluation, and accommodation of otherwise disabled children; and failure to perform legally required responsibilities in a timely manner, including providing and implementing transition plans, transitional support services, assistive technology services, and declassification services for children with disabilities.); *see also Scaggs v. N.Y. State Dep't of Educ.,* 2007 WL 1456221, at *6 (E.D.N.Y. May 16, 2007) (excusing exhaustion where plaintiffs alleged "complete inadequacy of the educational environment at [school]"); *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 294 (S.D.N.Y. 2007) (excusing exhaustion where plaintiffs claimed, among other things, that the County: failed to properly and timely identify or evaluate

children; limited the amount, duration and availability of services; and failed to provide services required by plaintiffs' IEPs.).

Finally, inexplicably, Plaintiffs make conflicting arguments: first, Plaintiffs argue that the Defendants failed "to provide notice and advise parents and student[s] of due process rights…which then *triggers any of the administrative and other proceedings that any individual petitioner would have to then bring*."  Pl. Mem. at 28.  But then, seven pages later, Plaintiffs argue that "administrative officers simply do not have the right to make a ruling" on the issues in this case and if Plaintiffs and those similarly situated were made to all bring individual administrative actions, "the administrative system in New York, an already overburdened system, would grind to a halt."  Pl. Mem. at 36.  These two arguments directly conflict. Plaintiffs are ostensibly arguing, on the one hand, that they are entitled to the procedural safeguards afforded by IDEA, including the administrative hearing process, but also that the administrative hearing process would be futile to resolve their claims.  Plaintiffs' attempt to argue both sides of this issue reveals the weakness of their claims.

Accordingly, because Plaintiffs cannot demonstrate that they are likely to succeed on the merits, their motion for a preliminary injunction should be denied.

## POINT III

## PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Plaintiffs cannot demonstrate irreparable harm absent the injunctive relief they seek, which is "the single most important prerequisite for the issuance of a preliminary injunction." *Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012).  To satisfy the irreparable harm requirement, a plaintiff "must demonstrate that absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and

imminent...." *Seifullah v. City of New York*, 2017 WL 4339478 at *1 (E.D.N.Y. Sept. 27, 2017)

(quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) and

citing *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)); *see*

*also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (standard requires plaintiffs

seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an

injunction) (emphasis in original).

First, Plaintiffs' claim fails because while they refer to "rights to education protected by

the Constitution," they do not articulate what they claim those rights to be. Because Plaintiffs

cannot show a constitutional injury, their claim fails. *See Lore v. City of Syracuse*, 2001 WL

263051, at *6 (N.D.N.Y. Mar. 9, 2001) ("[T]he mere allegation of a constitutional infringement

itself does not constitute irreparable harm."); *see also Donohue v. Mangano*, 886 F. Supp. 2d

126, 150 (E.D.N.Y. 2012) ("T]he assertion of constitutional injury is insufficient to

automatically trigger a finding of irreparable harm."). [11]  A finding of irreparable harm is

warranted only where a constitutional injury is "convincingly shown." *Id.*[12]

Second, the educational harm that Plaintiffs allege they are currently suffering is not a

result of PHL § 2164, but is rather a consequence of Plaintiffs' affirmative choice not to

vaccinate their children, and consequently, to opt out of public or private school. As explained

above, Plaintiffs are entitled to home school their children and, regardless of whether the

---

[11] To the extent Plaintiffs are relying, generally, on the Supremacy Clause to claim they are being deprived of a constitutional right, that is insufficient. Plaintiffs must articulate a specific constitutional right of which they allege they are being deprived, which they do not.

[12] Further, to the extent Plaintiffs are implicitly arguing the deprivation of a First Amendment violation, Plaintiffs have not established purposeful interference with their First Amendment rights or any other constitutional right. *See, e.g.*, *Phillips,* 775 F.3d at 543 ("[M]andatory vaccination as a condition for admission to school does not violate the Free Exercise Clause.");*Workman*, 419 Fed. App'x at 356 ("[T]he Supreme Court has consistently recognized that a state may constitutionally require school children to be immunized"); *Viemeister*, 179 N.Y. at 241-42 ("No right conferred or secured by the Constitution was violated by" law requiring vaccines as precondition for school attendance.).

children are home schooled or attend public, private, or parochial school, they are entitled to special education services. While parents of students who previously had non-medical exemptions may experience a transition period following the amendment, the law contemplates and accepts that; in fulfilling its mandate under IDEA, in certain circumstances, a state's carrying out of its administrative processes may take time. And this is true for *all* students – both students with disabilities and general education students – who decide to opt out of public or private school. *See*, *e.g.*, *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 206 (2d Cir. 2007) ("In fulfilling this mandate [under IDEA], there are no general time and manner requirements placed on the states other than those provided in the IDEA and created by the states.) (citing *See Coleman v. Newburgh Enlarged City Sch. Dist.,* 319 F. Supp. 2d 446, 450–51 (S.D.N.Y. 2004) (describing administrative processes available to plaintiff); *see also Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 123 (2d Cir. 1998).

Finally, with respect to the procedural safeguards that Plaintiffs allege they are being denied, for the reasons set forth in Point II.D, *supra*, Plaintiffs are not entitled to such procedural safeguards because they are not triggered where, as here, there is a change in a generally applicable state law.

For the aforementioned reasons, Plaintiffs cannot demonstrate that they will suffer irreparable harm absent the Court's issue of the requested injunctive relief.

## POINT IV

### THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR THE ENFORCEMENT OF PHL § 2164, AS AMENDED.

Finally, the balance of the equities and the consideration of the public interest decidedly weigh in favor of the continued enforcement of PHL § 2164, as amended, for the protection of vulnerable children, immunocompromised individuals, and the general public.

36

Here, because "the Government's interest *is* the public interest," the balance of hardships and public interest merge as one factor. *Saget v. Trump*, 375 F. Supp. 3d 280, 339–40 (E.D.N.Y. 2019) (emphasis in original). In making a determination as to the equities, a court may only issue an injunction if the balance of hardships tips in the plaintiff's favor. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *Winter*, 555 U.S. at 20 and *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)). Further, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction. *Salinger*, 607 F.3d at 80 (citing *eBay*, 547 U.S. at 391).

In exercising their discretion in whether to enter an injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *New York State Rifle & Pistol Ass'n v. City of New York*, 86 F. Supp. 3d 249, 258 (S.D.N.Y. 2015), *aff'd sub nom. New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 883 F.3d 45 (2d Cir. 2018) (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)). This includes the government's interest in public health. *Million Youth March, Inc. v. Safir*, 155 F.3d 124, 125–26 (2d Cir. 1998) (modifying injunction because District Court failed to consider government's interest in, *inter alia*, public health against First Amendment rights) and *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 711 (2d Cir. 1982) (whether the relief sought is in the public interest is a factor to be considered.)

As described at length above, the public interest in this matter unequivocally supports the continued enforcement of PHL § 2164 because the state legislature repealed the non-medical exemption in response to the worst outbreak of measles in twenty-five years. *See, e.g.,* Exs. A, B, C to Matthews Decl.; Blog Decl. ¶¶ 11-19, 25-26; *see also* pp. 4-7, *supra*. In doing so, the Legislature found that: "As a result of non-medical vaccination exemptions, many

communities across New York have unacceptably low rates of vaccination, and those unvaccinated children can often attend school where they may spread the disease to other unvaccinated students, some of whom cannot receive vaccines due to medical conditions." Ex. A to Matthews Decl. (Legislation Statement); *see also* Exs. B, C to Matthews Decl. (Senate Memo and Assembly Memo); pp. 6-7, *supra*. The purpose of the amendment to PHL § 2164 is to help protect the public amidst this ongoing outbreak, and thus the public interest strongly favors the continued enforcement of the law, without any non-medical exemptions. *Id*. In the instant case, the public interest would be *disserved* by the issuance of a preliminary injunction.

When a party seeks preliminary injunctive relief that would impair the government's ability to "exercise [its] police powers to protect public health and safety," the equities favor the government because it has "been legally charged with enforcing the law for the benefit of the community." *City of New York v. Miller*, 20 Misc. 3d 1117(A) (Sup. Ct. Kings Cty. 2008); *see also McDermott v. City of Albany*, 309 A.D.2d 1004, 1005-06 (Sup. Ct. Albany Co. 2003) (balance of equities weighed in favor of "correct[ing] a serious threat to public health, safety and welfare"). The State's interest in protecting the public, including vulnerable children whose health would be compromised by being vaccinated, from further outbreaks of measles and other contagious diseases far outweighs the interests of a small subset of the public who object to vaccinations on religious grounds. *See, e.g.*, *McDermott v. City of Albany*, 309 A.D.2d at 1005-06 (Sup. Ct. Albany Co. 2003); *Ramanadhan v. Wing*, 257 A.D.2d 383, 384 (1st Dep't 1999); *Miller*, 20 Misc. 3d 1117(A). Allowing Plaintiffs and other unvaccinated students admission to the state's schools will undoubtedly weaken the effectiveness of communities' "herd immunity" and could lead to the unvaccinated children's potentially spreading disease to other unvaccinated students. Blog Decl. ¶¶ 20, 21.

For the reasons above, the State's interest in exercising its police powers to protect the health and welfare of vulnerable individuals and the broader general public demonstrate that the balance of the equities and the consideration of the public interest weigh in favor of the continued enforcement of PHL 2164, as amended.

## CONCLUSION

For the reasons herein, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated: New York, New York
August 13, 2019

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*
By:

_____/s/_____
Elyce N. Matthews
Assistant Attorney General
28 Liberty Street
New York, New York 10005
Tel. (212) 416-8910