UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
V.D., et al.,                                                 :
                                                              :          2:19-cv-04306-ARR-RML
                                    Plaintiffs,               :
                                                              :
             -against-                                        :
                                                              :
STATE OF NEW YORK, et al.,                                    :
                                                              :
                                    Defendants.               :          OPINION & ORDER
                                                              :
------------------------------------------------------------- X

ROSS, United States District Judge:

 Plaintiffs, six parents of children with disabilities, filed this complaint on July 25, 2019

against Governor Andrew Cuomo, Attorney General Letitia James, the New York State

Department of Education, Commissioner MaryEllen Elia, and Executive Deputy Commissioner

Elizabeth Berlin (collectively, "defendants"). Until recently, plaintiffs' children were enrolled in

schools throughout New York state, where they were provided with individually-designed special

education and related services pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400, *et seq*. Prior to June 13, 2019, plaintiffs claimed a religious exemption

to the state's mandatory vaccination law, New York Public Health Law § 2164(9) (McKinney

2015) (repealed June 13, 2019). On June 13, 2019, the religious exemption was repealed by the

state legislature ("the law" or "the repeal"). All families—except for those who obtain a statement

from a physician certifying that "immunization may be detrimental to a child's health"—are now

required to vaccinate their children in order to enroll them in public, private, or parochial schools.

*See* N.Y. Pub. Health Law § 2164(6) (McKinney 2019).

 Plaintiffs argue that the new version of § 2164 is preempted by the IDEA. They filed this

motion for a preliminary injunction on August 5, 2019, seeking an immediate restoration of the

1

religious exemption during the pendency of this litigation. In the alternative, they seek a "stay-put order," pursuant to 20 U.S.C. § 1415(j), requiring defendants to maintain the most recent agreed-upon educational placement for students with disabilities during the course of this litigation. For the reasons set forth below, plaintiffs' motion is DENIED.

## BACKGROUND

### I.     New York Public Health Law § 2164

New York Public Health Law § 2164 requires "every person in parental relation to a child in this state [to] have administered to such child an adequate dose or doses" of certain "immunizing agent[s]," including those that guard against mumps, measles, diptheria, and hepatitis B. § 2164(1)(d) (McKinney 2019). When applying for admission to a "public, private, or parochial . . . school," parents and guardians are required to provide schools with certificates of their child's vaccination history. *Id.* §§ 2164(1)(a), (6). For more than 50 years, however, the statute provided an exception for "children whose parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to the practices" required by the law. N.Y. Pub. Health Law § 2164(9) (McKinney 2015) (repealed June 13, 2019); Compl. ¶ 84, ECF No. 1. For such children, no immunization certificate was required in order to gain admission to a New York state school. N.Y. Pub. Health Law § 2164(9).

Plaintiffs allege that the religious exemption permitted approximately 0.05% to 1% of students in New York State to attend school without immunizations. *See* Compl. ¶ 86. According to Dr. Debra Blog, the Director of the Division of Epidemiology for New York State's Department of Health, the "number of children entering school with a valid religious exemption ha[d] risen" in the years prior to the repeal—even as the total number of children entering school decreased and the percentage of children claiming medical exemptions remained steady. Blog Decl. ¶ 15,

ECF No. 15. During the 2017–2018 school year, 26,627 students in the state claimed a valid religious exemption to the mandatory vaccination law. *Id.*

During the 2018–2019 school year, measles outbreaks were reported across New York, including in New York City and Rockland County. *See* Compl. ¶ 90; *see also* Mack Rosenberg Decl., Ex. 1, at 2, ECF No. 6-3 ("Senate Memo") ("As of May 20th, 2019, there have been at least 810 confirmed cases of measles in New York State since October 2018."). These outbreaks were concentrated in communities with lower vaccination rates and relatively high percentages of parents with religious exemptions. *See* Blog Decl. ¶ 16–19.[1] In January 2019, both chambers of the state legislature proposed bills to repeal the religious exemption, with the goal of "avoid[ing] future outbreaks of vaccine-preventable illnesses like measles." Matthews Decl., Ex. D, at 2, ECF No. 14-4; *see also* Matthews Decl., Ex. A, ECF No. 14-1; Matthews Decl., Ex. B, ECF No. 14-2. The repeal was enacted on June 13, 2019 and signed into law by Governor Cuomo on the same day. Compl. ¶ 98. The repeal eliminates the religious exemption and requires principals, teachers, and other school staff members to prohibit unvaccinated children from attending public, private, or parochial schools. N.Y. Pub. Health Law § 2164(7)(a) (McKinney 2019).

According to plaintiffs, the legislation was modeled after a similar repeal enacted in California in 2015. *See* Compl. ¶ 100; *see also* Senate Memo 2 ("For guidance in dealing with this epidemic, we need only look to California, which repealed all non-medical exemptions to vaccination requirements under their state law . . . ."). Despite this stated inspiration, however, New York's repeal differs from California's in one material respect: unlike New York's law, California's law contains a provision explaining that it "does not prohibit a pupil who qualifies for an individualized education program, pursuant to federal law and Section 56026 of the Education

---

[1] Plaintiffs object to Dr. Blog's characterization of the measles outbreaks, but they cite no evidence that contradicts her conclusions. *See also infra* note 7.

3

Code, from accessing any special education and related services required by his or her individualized education program." Cal. Health & Safety Code § 120335(h) (West 2016). In a guidance letter published soon after the New York repeal, the state clarified that its "new law applies to students who receive special education services," though it "does not affect valid *medical* exemptions." Mack Rosenberg Decl., Ex. 8, at 5, ECF No. 6-7 (emphasis added).

On July 18, 2019, New York's Department of Health, Office of Children and Family Services, and State Education Department issued a joint guidance letter responding to frequently-asked questions about the repeal. *See* Mot. for Prelim. Inj. 7–8, ECF No. 6-1; Mack Rosenberg Decl., Ex. 9, ECF No. 6-11 ("July Guidance Letter"). The letter explained that children attending year-round schools were required to receive the first age-appropriate dose of all required vaccines by June 28, 2019; if they failed to comply with this requirement, "[t]hese children must be excluded from school immediately." July Guidance Letter 4; *see also* N.Y. Pub. Health Law § 2164(7)(a) (McKinney 2019). For students who do not attend year-round schools, parents must provide proof of initial vaccinations within fourteen days "after the first day of instruction in September." *Id.* at 3. Within 30 days of the first day of school, all parents must "provide evidence of age appropriate appointments for the next follow-up doses" of all required vaccines. *Id.* at 5–6; *see also* N.Y. Pub. Health Law § 2164(7)(a) (McKinney 2019).

## II.    The Plaintiffs

Plaintiffs are the parents of children with disabilities who qualify for special education and related services under the Individuals with Disabilities Education Act. Compl. ¶ 20.[2] Before the

---

[2] V.D.'s two children, J.M.D. and N.M.D., are both diagnosed with Down Syndrome. *See* V.D. Decl. ¶ 3, ECF No. 6-14. J.M.D. and N.M.D. each have individualized education programs ("IEPs") that include the following services: "a class with 8 students, 1 teacher and 1 assistant . . . ; speech therapy . . . ; occupational therapy . . . ; individual physical therapy . . . ; and counseling." *Id.* ¶¶ 5–6. T.S. is the mother of C.S., who is diagnosed with severe Autism Spectrum Disorder. *See* T.S. Decl. ¶ 3, ECF No. 6-17. T.S.'s IEP includes a class with 6 students, 1 teacher and 2 assistants, occupational therapy, and individual speech therapy. *Id.*

repeal, plaintiffs had religious exemptions that allowed their children to attend schools in New York state without immunization certificates. *Id.*; *See also* V.D. Decl. ¶ 9, ECF No. 6-14; T.S. Decl. ¶ 8, ECF No. 6-17; S.K. Decl. ¶ 8, ECF No. 6-20; P.E.T. Decl. ¶ 8, ECF No. 6-22; B.C. Decl. ¶ 8, ECF No. 6-25. Since the enactment of the new version of § 2164 on June 13, 2019, plaintiffs have failed to comply with the law's immunization requirements; as a result, their children will be unable to attend school in September. *See* V.D. Decl. ¶ 12; T.S. Decl. ¶ 9; S.K. Decl. ¶ 7; P.E.T. Decl. ¶ 6; B.C. Decl. ¶ 6. Additionally, some of the plaintiffs' children previously received extended school year services during the summer, but they have been prohibited from attending these programs due to their failure to comply with the repeal. *See* V.D. Decl. ¶ 10; T.S. Decl. ¶ 9; S.K. Decl. ¶ 10. Plaintiffs allege that their children are being deprived of "access to special education and related services mandated by their IEPs," and that the repeal has interfered with their work schedules by requiring that they stay home to care for their children. *See, e.g.*, V.D. Decl. ¶¶ 12, 15–17. They also allege that their children will regress behaviorally and academically as a result of the gap in services following the repeal. *See, e.g.*, *id.* ¶ 14; B.C. Decl. ¶ 9.

### III. The Preliminary Injunction Motion

Plaintiffs filed the instant motion for a preliminary injunction on August 5, 2019. *See* Mot. for Prelim. Inj. They seek an order enjoining the defendants from implementing the repeal, thus restoring the version of § 2164 that was in place prior to June 13, 2019. *See id.* at 36. They argue that they are entitled to relief under both the traditional preliminary injunction standard and under

---

¶ 5. S.K. is the mother of A.K., who is diagnosed with Autism Spectrum Disorder. *See* A.K. Decl. ¶ 4, ECF No. 6-20. A.K.'s IEP provides for an individual aide, adaptive physical education, and individual speech therapy. *Id.* ¶ 5. P.E.T. and H.T. are the parents of D.T., a child with a speech or language impairment. P.E.T. Decl. ¶ 3, ECF No. 6-22. D.T.'s IEP includes placement in an integrated co-teaching class, occupational therapy, speech therapy, and physical therapy. *Id.* ¶ 5. Finally, B.C. is the mother of D.C., a child with a speech or language delay. B.C. Decl. ¶ 3, ECF No. 6-25. D.C.'s IEP provides for placement in an integrated co-teaching class, occupational therapy, speech therapy, and physical therapy. *Id.* ¶ 5.

the "stay-put" provision of the IDEA. *See id.* at 25. In the alternative, their complaint asks the court to stay the repeal insofar "as it applies to children with rights under IDEA." Compl. ¶ 124(b).

In support of their motion, plaintiffs allege several conflicts between the IDEA and § 2164, and they argue that these conflicts demonstrate that the repeal of the religious exemption is preempted by federal law. Specifically, they argue that the repeal conflicts with the IDEA because: (1) it creates an "impermissible condition precedent for students protected by the IDEA to obtain . . . services," (2) it allows for "the summary dismissal of all students with IEPs who do not comply with the amended law," and (3) it fails to provide parents with notice and other procedural safeguards before changing a student's placement and services. Mot. for Prelim. Inj. 27–28. Plaintiffs also allege that there are less intrusive ways for the state to guard against outbreaks of communicable diseases while also protecting the rights of students under the IDEA. They cite to guidance letters provided by the United States Department of Education and the Office of Special Education and Related Services for support. *Id.* at 14-15; Mack Rosenberg Decl., Ex. 3, ECF No. 6-5 ("OCR Letter"); Mack Rosenberg Decl., Ex. 4, ECF No. 6-7 ("OSERS Letter"). These letters instruct schools to provide continued special education and related services, where possible, to ensure that students with disabilities receive a free, appropriate public education in the event of school closures or other exclusions that constitute a "change in placement"—including when closures are required to prevent against the contraction of measles and other diseases. *See, e.g.*, OCR Letter 1–2; OSERS Letter 4–5.

**LEGAL STANDARD**

I.      **The Individuals with Disabilities Education Act**

The Individuals with Disabilities Education Act ("IDEA" or "Act"), enacted into law in 1990 and reauthorized by Congress in 2004, "offers States federal funds to assist in educating children with disabilities." *Andrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S.

Ct. 988, 993 (2017); *see also* Pub. L. No. 108-446.[3] The Act divides responsibility between local education agencies ("LEAs"), which are directly responsible for "providing for the education of children with disabilities within [their] jurisdiction," and state education agencies ("SEAs"), which have a supervisory role in ensuring compliance with the IDEA. *See* 20 U.S.C. § 1413(a)(1); § 1412(11)(A). Among the Act's core purposes is to ensure that children with disabilities are provided with a free appropriate public education ("FAPE"). *See* 20 U.S.C. § 1400(d)(1)(A). FAPE is defined as "special education and related services" that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under [the Act].

§ 1401(9). States are responsible for ensuring the provision of FAPE to all children with disabilities who qualify for services under the Act, including children who are suspended or expelled from school. § 1412(a)(1)(A); 34 C.F.R. § 300.530(d). The individualized education program, or IEP, is "the centerpiece of the statute's educational delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). An IEP must be "developed, reviewed, and revised for each child with a disability." 34 C.F.R. § 300.112. Each child's IEP must contain certain information, including the student's present levels of performance, goals, and a description of the "special education and related services and supplementary aids and services . . . to be provided to the child." 34 C.F.R. § 300.320(a). Special education is defined to include "specially designed instruction . . . to meet the unique needs of a child with a disability"; related services are the supports "required to assist a child . . . to benefit from special education." §§ 1401(26), (29). "To the maximum extent

---

[3] The Education for All Handicapped Children Act ("EAHCA") was the precursor statute to the IDEA, and it was enacted by Congress in 1975. *See Honig v. Doe*, 484 U.S. 305, 309 (1988).

appropriate," states should ensure that IEPs provide for instruction in the "least restrictive environment"—a setting that allows students with disabilities to be educated alongside children who are not disabled. § 1412(5)(A).

## A. Procedural Safeguards

Each child's IEP is developed and revised as part of a collaborative process between members of the school and the child's parents or guardians. *See Endrew*, 137 S. Ct. at 994; § 1414(d)(1)(B). If a parent disagrees with the school's IEP decisions, the Act "establishes various procedural safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311. For example, before an LEA proposes or initiates a change in a child's educational placement or the provision of FAPE, the LEA must provide written notice to the parent. § 1415(b)(3). Among other things, the notice must inform parents of the proposed action, the rationale for the action, and an explanation of parents' options for contesting the change. § 1415(c)(1); *see also* 34 C.F.R. § 300.504(c). If less formal dispute resolution measures prove unsuccessful, parents may pursue an "impartial due process hearing" before a state or local educational agency. § 1415(f)(1)(A).

## B. Stay-Put

In the event of a dispute between parents and a school regarding a proposed change in the child's educational placement, the Act entitles the child to "remain in the then-current educational placement" while any "proceedings" conducted under § 1415 are pending. § 1415(j). This provision, known as the pendency or stay-put provision, "is, in effect, an automatic preliminary injunction." *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982). If the provision applies, "the child *shall* remain in the then-current educational placement of the child." *Id.*

(emphasis added). The "then-current educational placement" is the placement that was "last agreed upon for the child." *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15 CV 9679 (NSR), 2018 WL 4103494, at *3 (Aug. 28, 2018) (quoting *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015).

Phrased in mandatory language, the stay-put provision "substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." *Zvi D.*, 694 F.2d at 906. Under the provision, as long as a parent has initiated a proceeding pursuant to § 1415, a child is entitled to an injunction against any district-proposed change that would move her from her "then-current educational placement." *D.M. v. N.J. Dep't of Educ.*, 801 F.3d 205, 211 (3d Cir. 2015).

### C. New York's Provisions for Homeschooled Students with Disabilities

Though the IDEA is silent regarding the provision of special education services to homeschooled students, New York's Education Law § 3602-c allows students with disabilities who are educated in home instruction programs to receive special education services provided by their school district of residence. N.Y. Educ. Law § 3602-c(2-c) (McKinney 2008); 71 Fed. Reg. 46,540, 46,594 (Aug. 14, 2006); *see also* Matthews Decl., Ex. E, ECF No. 14-5 ("DeLorenzo Memo"). In order to receive these services, a parent must first complete an Individualized Home Instruction Plan ("IHIP") and make a written request for services to the local school district's board of education. *See* DeLorenzo Memo 1–2. Then, in collaboration with the Committee on Special Education, an Individualized Education Services Plan ("IESP") is developed for a homeschooled child, which specifies the services that must be provided by the district. *Id.* at 2. Such services must be provided to homeschooled students "on an equitable basis as compared to special

education programs and services provided to other students with disabilities attending public or nonpublic schools within the district." *Id.*

## II. Preliminary Injunction Standard

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Resources Defense Counsel*, 555 U.S. 7, 24 (2008). "The purpose of a preliminary injunction is 'to keep the parties[,] while the suit goes on, as far as possible in the respective positions they occupied when the suit began' and to preserve the court's ability to render a meaningful decision after a trial on the merits." *ImOn, Inc. v. ImaginOn, Inc.*, 90 F. Supp. 2d 345, 349 (S.D.N.Y. 2000) (quoting *WarnerVision Entm't v. Empire of Carolina, Inc.*, 101 F.3d 259, 261–62 (2d Cir. 1996)). In the Second Circuit, a party seeking a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) must show "(a) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed., Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "This two-track rule, however, is subject to an exception: A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme.'" *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)). Because plaintiffs seek to enjoin conduct taken pursuant to "legislation or regulations developed through presumptively reasoned democratic processes," they must meet the heightened standard of a likelihood of success on the merits, and the "fair-ground-for-litigation" alternative is inapplicable to their motion. *Olson v. Wing*, 281 F. Supp. 3d 476, 485 (E.D.N.Y. 2003).

## III. Preemption

Finally, because plaintiffs allege that § 2164 is preempted by the IDEA, I briefly describe the doctrine of preemption before proceeding to an analysis of plaintiffs' requested relief. Consistent with the Supremacy Clause, which provides that federal law "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, state laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution" are invalid. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824). Still, "because the States are independent sovereigns in our federal system," there is a presumption that "Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *see also Arizona v. United States*, 567 U.S. 387, 400 (2012) ("[C]ourts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress." (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))).

There are three types of preemption: express, conflict, and field. *See N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (citing *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005)). Plaintiffs argue that conflict preemption applies to this case. *See* Mot. for Prelim. Inj. 26; *see also E. Ramapo Cent. Sch. Dist. v. DeLorenzo*, No. 13-CV-1613 (CS), 2013 WL 5508392, at *8 (S.D.N.Y. Oct. 3, 2013) ("Because the IDEA lacks a preemption provision and specifically provides a role in special education services to states[,] . . . preemption would exist, if at all, only under a conflict preemption theory." (citation omitted)). A state law impermissibly conflicts with a federal law where "compliance with both federal and state regulations is a physical impossibility," or, in the alternative, where "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*, 725 F.3d 65, 97 (2d Cir. 2013).

**DISCUSSION**

After a careful and thorough review of plaintiffs' arguments, I conclude that plaintiffs have failed to demonstrate that they are entitled to either a preliminary injunction or a stay-put order. The remainder of this opinion proceeds as follows. I begin with an overview of the ample discretion afforded to states to protect the public health and welfare of their constituents, including by enacting mandatory vaccination laws. Then, with that history as a background, I conclude that the IDEA does not preempt § 2164, as there is no conflict between federal requirements for providing special education to students with disabilities and a neutral state law that mandates compliance with immunization requirements for all students. Finally, I hold that plaintiffs are not entitled to a stay-put order under the IDEA because their failure to comply with § 2164—a unilateral action taken by the parents of children with disabilities—does not constitute a change in placement sufficient to trigger stay-put relief.

I.   **Mandatory vaccination laws are a permissible use of state police power, and states are free to pass laws that mandate compliance with immunization requirements.**

States have historically enjoyed considerable discretion to regulate in areas affecting the health and safety of their citizens. *See, e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). As such, the Supreme Court has long upheld the rights of states to enact compulsory vaccination laws. *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905). "[A] community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. In service of this goal, a state may impose certain requirements on its constituents without offending the Constitution. *See id.* at 26 ("[T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."); *see also Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not

include liberty to expose the community or the child to communicable disease or the latter to ill health or death." (citing *People v. Pierson*, 68 N.E. 243 (N.Y. 1903))).

Recently, in 2015, the Second Circuit upheld the constitutionality of New York's compulsory vaccination law, which mandates vaccinations as a condition for school attendance. *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015). The court also held that § 2164— which, at the time, included a religious exemption—"goes *beyond* what the Constitution requires by allowing an exemption for parents with genuine and sincere religious beliefs." *Id.* (emphasis added). Echoing the Second Circuit, the Southern District of California held in 2016 that a state is not required to provide an exemption to mandatory vaccination laws for parents who object to the law's requirements on religious grounds. *Whitlow v. California*, 203 F. Supp. 3d 1079, 1086 (S.D. Ca. 2016) (denying plaintiffs' motion to preliminarily enjoin the state from enforcing Cal. Health & Safety Code § 120335); *see also Workman v. Mingo Cty. Bd. of Educ.*, 419 F. App'x 348, 354, 356–57 (4th Cir. 2011) (affirming district court's holding that, "although a state may provide a religious exemption to mandatory vaccination, it need not do so").

The case law clearly establishes that "[c]onditioning school enrollment on vaccination has long been accepted by the courts as a permissible way for States to innoculate large numbers of young people and prevent the spread of contagious diseases." *Whitlow*, 203 F. Supp. 3d at 1091. A state's compulsory immunization law is a proper exercise of police power, *Zucht v. King*, 260 U.S. 174, 176 (1922), and such legislation is supported by a state's strong interests in protecting the public health and welfare, *see, e.g.*, *Whitlow*, 203 F. Supp. 3d at 1086.

## II. Plaintiffs are not entitled to a preliminary injunction because they have not demonstrated a likelihood of success on the merits.

As stated above, because plaintiffs seek to enjoin governmental action taken pursuant to a statute, they must establish three things: (1) a likelihood of success on the merits, (2) irreparable

harm, and (3) that a preliminary injunction is in the public interest. "In order to demonstrate a likelihood of success on the merits, plaintiffs are not required to show that success on their complaint is an absolute certainty, but rather that the probability of success is 'better than fifty percent.'" *People of New York ex rel. Spitzer v. County of Delaware*, 82 F. Supp. 2d 12, 17 (N.D.N.Y. 2000) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)). Thus, plaintiffs must demonstrate that they are likely to succeed on their claim that the IDEA preempts § 2164. *See* Defs.' Opp'n 18, ECF No. 13. As I explain below, because they have failed to do so, they are not entitled to preliminary injunctive relief.

Plaintiffs allege several conflicts between the IDEA and § 2164, and they argue that these conflicts require the immediate restoration of the religious exemption. *See* Mot. for Prelim. Inj. 36–37. Ultimately, plaintiffs' arguments in support of their motion hinge on their claim that the amended version of § 2164 "creates an impermissible condition precedent for students" to receive agreed-upon services under the IDEA. *Id.* at 26–27.[4] This argument misinterprets the scope of conflict preemption, and it is inconsistent with clearly established law preserving the authority of states to pass legislation that protects public health and welfare. *See supra* Part I.

When evaluating a plaintiff's preemption claim, courts begin "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting

---

[4] Plaintiffs allege two other conflicts between the IDEA and § 2164. First, they argue that the summary dismissal of children with disabilities from school conflicts with the right under the IDEA to receive services in the previously agreed-upon placement. *See* Mot. for Prelim. Inj. 28. Second, they argue that the state's failure to provide notice before effectuating a change in placement conflicts with the IDEA's procedural safeguards provisions. *See id.* If anything, these alleged conflicts would entitle the *individual* plaintiffs to a stay-put order—not to a complete injunction banning defendants from enforcing the repeal as to all students. However, because I conclude that plaintiffs have not demonstrated that the repeal constituted a change in placement that would entitle them to *any* procedural safeguards under the Act, I deny their request for a stay-put order. *See infra* Part III.

*Lohr*, 518 U.S. at 485)). Public education and health and safety are areas of legislation that have traditionally "fallen within the province of states." *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 86 (2d Cir. 2006); *Edwards v. Aguillard*, 107 S. Ct. 2573, 2577 (1987). Where possible, courts should "accept the reading [of a statute that] disfavor[s] pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005). A plaintiff alleging conflict preemption must demonstrate that "state law actually conflicts with or frustrates the purpose of federal law. Thus, if it is possible to comply with both federal and state law, there is neither a conflict nor a frustrated purpose." *Bravman v. Baxter Healthcare Corp.*, 842 F. Supp. 747, 753 (S.D.N.Y. 1994). "The critical question is whether the state requirement 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Sarah M. v. Weast*, 111 F. Supp. 2d 695, 702 (D. Md. 2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Here, it is entirely possible to comply with both the compulsory immunization provisions of § 2164 and the IDEA. Plaintiffs do not allege that their children are unable to receive vaccinations as a result of their disabilities; indeed, if they did, they would likely qualify for medical exemptions under § 2164(8). Instead, plaintiffs have made the affirmative choice not to vaccinate their children for non-medical reasons, thus opting out of public, private, and parochial schools in New York state. As the defendants acknowledge, plaintiffs are "well within their right to do so," Defs.' Opp'n 21, but the law does not entitle them to a religious exemption to a generally-applicable health and welfare law. *See Phillips*, 775 F.3d at 543; *Whitlow*, 203 F. Supp. 3d at 1091 ("Conditioning school enrollment on vaccination has long been accepted by the courts as a permissible way for States to innoculate large numbers of young people and prevent the spread of contagious diseases.").

If the court were to accept plaintiffs' argument that a generally-applicable vaccination rule impermissibly conflicts with the IDEA, a host of neutral school policies would be subject to invalidation. "[L]ocal school boards have broad discretion in the management of school affairs," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863 (1982), and schools make policies on a range of issues that could engender controversy and parental disapproval, including curricula choices, required reading, and even uniform requirements. The IDEA's silence on an issue—such as the requirement for a vaccination—does not mean that there is an irreconcilable conflict with a state law. "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Madeira v. Affordable Housing Found., Inc.*, 469 F.3d 219, 241 (2006). Moreover, where, as here, the federal and state laws serve entirely different objectives, courts are more likely to find that the two laws are not in conflict. *See, e.g.*, *In re MBTE*, 725 F.3d 65, 101.

The cases upon which plaintiffs rely do not compel a different conclusion. In *Evans v. Evans*, 818 F. Supp. 1215 (N.D. Ind. 1993), for example, a state law impermissibly conflicted with the IDEA because it provided for lengthy delays between the development and implementation of a child's IEP. *Id.* at 1223. The law was thus in direct conflict with regulations to the IDEA, which mandated implementation of IEPs "as soon as possible" after their development. *Id.* Likewise, in *Sarah M. v. Weast*, the court held that a Maryland statute was preempted by the IDEA because it set a timeline for parents to provide notice of a school transfer that was shorter than the timeline set forth in the IDEA. 111 F. Supp. 2d at 703. Clearly, the laws in *Sarah M.* and *Evans* differ from § 2164 in material respects: By authorizing behavior that was expressly forbidden by the IDEA, or mandating requirements that were beyond those imposed by the IDEA, they "enforce[d] more

burdensome limitations on access to FAPE" than the comparable rules established by Congress. Mot. for Prelim. Inj. 26. New York's repeal, however, does no such thing—it imposes an obligation on *all* parents that is perfectly consistent with the requirements of the IDEA.

The defendants' opposition motion explains that New York law allows parents to access special education services for homeschooled children. *See* Defs.' Opp'n 22–24.[5] In response, plaintiffs allege that they requested home services from the state, but the state refused to provide the requested services. *See, e.g.*, V.D. Decl. ¶ 10.[6] They also argue that the state has provided inconsistent and conflicting information about the application of § 2164 to homeschooled children, and that it may be too late in the school year for homeschooled children with disabilities to apply for special education services. *See* Reply 11–12, 23–26. Even if these services are not provided, however, that does not mean that § 2164 is preempted by the IDEA. Parents of children with disabilities may decide to opt-out of public, private, or parochial schools for any number of reasons, including because they fundamentally disagree with a neutral school requirement. The fact that a parent objects to a mandatory vaccination requirement and will thus be required to homeschool her children—with or without district-provided special education services—does not mean that the policy is invalid. And while plaintiffs allege that they do not have the skills or expertise to provide services to their children at home, *see, e.g.*, T.S. Decl. ¶ 16, they, like all

---

[5] New York's homeschooling provisions suggest that the state is doing more than necessary to accommodate the needs of children with disabilities who are educated at home. The IDEA does not mandate that states provide services to homeschooled students with disabilities, and instead leaves it up to states to determine whether home placements are included in the definition of "schools." *See* §§ 1401(6), (27) (defining "elementary school" and "secondary school," respectively, as "nonprofit institutional day or residential school[s] . . . as determined under State law"); *see also* 71 Fed. Reg. 46,540, 46, 594 (Aug. 14, 2006) ("Children with disabilities in home schools . . . must be treated in the same way as other parentally-placed private school children with disabilities . . . only if the State recognizes home schools . . . as private elementary schools or secondary schools.").

[6] Plaintiffs do not indicate that they have complied with New York's process for requesting and obtaining home-based special education services—including the submission of an IHIP and the development of an IESP. *See supra* Legal Standard Part I.C.

parents, can send their children to public, private, or parochial schools as long as they comply with the state's vaccination requirements. The plaintiffs' status as the parents of children with disabilities does not in any way alter their ability to comply with § 2164.

I am also not persuaded by plaintiffs' arguments regarding the distinctions between the New York statute and the California statute. *See supra* Background I. The fact that California's legislators opted to explicitly refer to students with disabilities in their statute eliminating a vaccination exemption—albeit in vague terms—does not mean that New York's legislators were required to do the same. California's statute was inspired by distinct events and resulted from a legislative process that was specific to the needs of that state. New York's legislators made their own, reasoned decisions about § 2164, and there is no justification for plaintiffs' argument that New York's statute must match California's in all respects. Furthermore, while the court in *Whitlow v. California* held that the California law's exemption for students with IEPs did not violate the equal protection clause, it did *not* hold that such an exemption was required by the IDEA. *See* 203 F. Supp. 3d at 1088.

The IDEA imposes an obligation on states to ensure the education of all students with disabilities, and the statutory scheme envisions a large role for states in "setting educational policy . . . [and] implement[ing] the statute's goals." *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 777 (2d Cir. 2002). Within this structure, states must serve *all* disabled children, and they are not required to make individual exceptions to sound policy in response to "the bare allegations of a single interested party." *Tilton by Richards v. Jefferson Cty. Bd. of Educ.*, 705 F.2d 800, 805; *see also D.M.*, 801 F.3d at 223 (3d Cir. 2015) (Schwartz, J., dissenting) ("Allowing a student to . . . block implementation of an action that applies to all students could obligate the state, 'against its reasoned judgment to . . . deprive other handicapped children of needed resources.'" (quoting

*Tilton*, 705 F.2d at 805)). Though plaintiffs disagree with the legislature's judgment, New York was entitled to determine that the religious exemption was endangering all students, and that the elimination of the exemption was the best way to protect the needs of all children—including children with disabilities.

Thus, because I conclude that plaintiffs have not demonstrated a likelihood of success on the merits of their preemption claim, they are not entitled to an order enjoining the enforcement of the repeal. *See Duka v. U.S. S.E.C.*, No. 15 357(RMB)(SN), 2015 WL 5547463, at *11 (S.D.N.Y. Sept. 17, 2015) (quoting *Greenlight Capital, L.P. v. Apple, Inc.*, No. 13 Civ. 900, 2013 WL 646547, at *13 (S.D.N.Y. Feb. 22, 2013) (observing that, "[w]here Plaintiff[s] fail[] to establish a likelihood of success on the merits, the Court 'need not reach' the remaining elements" for a preliminary injunction: irreparable harm and a showing that the balance of equities and the public interest are in plaintiffs' favor).[7]

---

[7] Nevertheless, I am persuaded by defendants' additional arguments regarding the plaintiffs' inability to establish the other prongs for a preliminary injunction. *See* Defs.' Opp'n 34–39. With respect to irreparable harm, plaintiffs allege that their children have experienced behavioral and academic regression as a result of the gap in services. They also allege that the removal of their children from school has negatively impacted their own careers. *See, e.g.*, Pls.' Reply 26-27 (citing record). I sympathize with plaintiffs and their children, and I do not doubt that these consequences are serious. But the fact remains that these impacts are the result of the plaintiffs' *own* decision not to vaccinate their children—not a direct and necessary consequence of the repeal. Plaintiffs argue that the law itself imposes harm by requiring schools to "permanently bar their children from school," Pls.' Reply 26, but a dismissal is only required if a parent fails to comply with the law. The harm plaintiffs allege results from their own personal choices; the repeal does not require the removal of any services from plaintiffs' children, nor does it necessitate any harm to plaintiffs.

   I also conclude that the balance of the equities and the public interest both strongly favor the continued enforcement of the repeal. *See Saget v. Trump*, 375 F. Supp. 3d 280, 339-40 (E.D.N.Y. 2019) ("[B]ecause the Government is a party, and 'the Government's interest *is* the public interest,' the balance of hardships and public interest merge as one factor." (quoting *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 673 (S.D.N.Y. 2019)). The repeal resulted from the New York legislature's judgment that rising rates of religious exemptions were endangering the public. *See, e.g.* Defs.' Opp'n 36–39. Public health and safety are areas in which states are traditionally granted considerable discretion. Though plaintiffs disagree with defendants' characterization of the measles outbreak that inspired the legislature to pass § 2164, they have not met their burden of demonstrating that judicial interference with the legislature's judgment is necessary to protect the public interest. On the contrary, the state has made a determination that the exemption was endangering vulnerable people and presenting an unreasonable risk of continued

### III. Plaintiffs are not entitled to a stay-put order because § 2164 does not constitute a change in placement.

In the alternative, plaintiffs argue that the stay-put provision of the IDEA, 20 U.S.C. § 1415(j), entitles them to their requested relief.[8] Pursuant to § 1415(j), if a parent has initiated a legal proceeding under the IDEA challenging a proposed change in educational placement, she is entitled to an order requiring the state and the LEA to maintain her child's then-current educational placement during the pendency of the litigation. *See* § 1415(j); *see also D.M.*, 801 F.3d at 211 (noting that a stay-put order depends on "two questions. First, is [plaintiff's] suit . . . a 'proceeding [] conducted pursuant to [§ 1415]'? Second, is [plaintiff's] 'educational placement' being altered?"). "The purpose of the provision is 'to maintain the educational status quo while the parties' dispute is being resolved.'" *E. Lyme Bd. of Educ.*, 790 F.3d at 452 (2d Cir. 2015) (quoting *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014)). It thus "represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *R.B. v. Mastery Charter Sch.*, 532 F. App'x 136, 139 (3d Cir. 2013) (quoting *Drinker ex rel. Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996)); *see also Zvi D.*, 694 F.2d at 906 ("This provision is, in effect, an automatic preliminary injunction.").

---

outbreaks; to allow plaintiffs' children to attend school despite this conclusion would disrupt the legislature's determinations and risk further harm.

[8] Just as it is improper for plaintiffs to seek an order enjoining the law as it applies to *all* children, the stay-put relief plaintiffs seek is broader than the relief provided for under the IDEA. Plaintiffs suggest that they may seek a stay-put order on behalf of all students with disabilities affected by the repeal. *See* Mot. for Prelim. Inj. 34. The language of the statute, however, allows only an *individual* parent to demand that a school maintain a current educational placement if she has initiated a proceeding under the IDEA on behalf of her child. *Id.* Thus, the only stay-put relief that plaintiffs could theoretically obtain would be an order allowing the individual named plaintiffs' children to remain in their educational placement.

The plain language of the IDEA clearly establishes that "the stay-put provision only comes into play when a child's 'educational placement' is changed or proposed to be changed." *Roher v. District of Columbia*, No. Civ. A. 89-2425, 1989 WL 330800, at *2 (D.D.C. Oct. 11, 1989).[9] Likewise, the notice and procedural safeguards provisions of the IDEA are violated only if the LEA "proposes to initiate or change" or "refuses to initiate or change" some aspect of the child's educational placement, including "identification, evaluation[,] . . . or the provision of a [FAPE]." § 1415(b)(3). "The heart of [this] case," then, is whether § 2164 imposes a change in the educational placement of plaintiffs' children. *N.D. v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010). The IDEA does not define the term "educational placement" or explain the types of school action that would constitute a change in such a placement. *See, e.g.*, *Concerned Parents & Citizens for the Continuing Ed. At Malcolm X (PS 79) v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 753–54 (2d Cir. 1980). However, the Supreme Court has held that the stay-put provision is intended to guard against a state's *unilateral* removal of a child from her existing educational placement. *See Honig*, 484 U.S. at 306 (holding that the stay-put provision "demonstrates a congressional intent to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students . . . from school"). Put differently, the stay-put provision does not remove

---

[9] I assume, without deciding, that plaintiffs' current lawsuit would constitute a proceeding under the IDEA sufficient to trigger a stay-put order with respect to plaintiffs' children. *See, e.g.*, *D.M.*, 801 F.3d at 212–13 (concluding that a suit filed in federal court challenging a state-wide action was sufficient to trigger stay-put relief because plaintiff was not required to exhaust administrative remedies where doing so would be futile); *see also Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199–200 (2d Cir. 2000) (holding that a plaintiff need not exhaust administrative remedies to pursue a stay-put order).

At the same time, however, I note that § 1415 provides a set of procedural safeguards for families who challenge a change in placement or the provision of FAPE. Here, plaintiffs do not challenge a specific aspect of the state's provision of FAPE to an individual child, or even a systemic educational practice that is alleged to have interfered with the provision of special education services to all students with disabilities. *Cf. D.M.*, 801 F.3d at 212–13 (holding that a federal lawsuit challenging an administrative regulation about the *provision of special education services* constituted a proceeding under § 1415 that entitled individual plaintiff to seek stay-put relief). Rather, they challenge a neutral state law that applies to *all* children. Therefore, it is questionable whether this lawsuit would qualify as a § 1415 proceeding.

all discretion from schools in the provision of special education. The IDEA adopts a "cooperative federalism" approach, retaining ample authority for states to make decisions about a child's education within the confines of the Act's procedural requirements. *See, e.g.*, Defs.' Opp'n 26–27. The stay-put provision merely prevents schools from making an automatic, independent—that is, unilateral—change to a child's placement that would significantly impact her education in the absence of parental approval.

Since the passage of § 2164, plaintiffs allege that their children are no longer receiving the services mandated by their IEPs. Though this abrupt removal of services was likely disorienting and difficult for plaintiffs and their children, I cannot conclude that it constituted a change in placement under the IDEA. The reason is simple: § 2164 did not itself mandate that plaintiffs' children stop receiving services in their previous agreed-upon educational placement. To the contrary, it was *plaintiffs'* affirmative decision not to comply with the neutral requirement imposed by the repeal that led to an alteration of services—not any unilateral action taken on the part of the state. In *Honig v. Doe*, the Supreme Court repeatedly emphasized that the stay-put provision and the other procedural safeguards embedded in the IDEA were designed to protect children from the harmful impacts caused by the *state's* unregulated alterations to a child's special education services. 484 U.S. at 320, 324–25 (holding that Congress's goal was to attack "exclusionary practices" that resulted in a "unilateral 'change in placement'"). The Court held that the IDEA prohibited a school district from "indefinitely suspending [a child] or otherwise altering his then current placement" without parental approval. *Id.* at 606. The school action challenged in *Honig* was automatic and immediate—it led to the unilateral removal of a child from his current educational placement, and provided no opportunity for the parent to intervene to stop the removal. *Id.*; *see also District of Columbia v. Vinyard*, 901 F. Supp. 2d 77, 83 (D.D.C. 2012) ("The purpose

of the stay-put injunction is to prevent educational authorities from unilaterally moving a child from his or her current placement." (quoting *Alston v. District of Columbia*, 439 F. Supp. 2d 86, 88 (D.D.C. 2006))).

Likewise, in *R.B. v. Mastery Charter School*, the Third Circuit held that a state law mandating the immediate and involuntary dismissal of a student violated the IDEA's stay-put provision. 532 F. App'x 136, 142 (3d Cir. 2013). Under the Pennsylvania law challenged in the case, the LEA was required to unilaterally disenroll a student after a series of unaccounted absences. *Id.* at 141. The court held that the law in *R.B.* changed a child's placement without allowing a parent to maintain the previously agreed-upon educational placement, thus impermissibly conflicting with the IDEA. *Id.* There was no opportunity for a parent to maintain the prior educational placement because any changes imposed by the law would necessarily "significantly affect the child's learning experience." *Id.*

In contrast, § 2164 neither mandates nor imposes a change in educational placement.[10] The law did not necessitate any alterations to plaintiffs' children's IEPs. *Cf. D.M.*, 801 F.3d at 221 (Schwartz, J., dissenting) ("The present record does not show that the [school] has taken steps to change [plaintiff's] IEP [or] that it intends to move [plaintiff] to a different school with a different educational program."). Instead, it announced a new and constitutionally-permissible condition for school attendance, and provided all parents—including plaintiffs—with an opportunity to comply

---

[10] In their reply, plaintiffs suggest that the defendants' opposition brief concedes that § 2164 constitutes a change in placement. *See* Pls.' Reply 3, ECF No. 16. While defendants, perhaps inelegantly, comment that it was a "change in state law that altered Plaintiffs' educational placement options," Defs.' Opp'n 29, their core claim is that "[p]laintiffs' affirmative choice not to vaccinate their children is an affirmative choice to opt out of public or private school in New York State," *id.* at 21. The term "change in placement" is a term of art under § 1415, and it has been interpreted as "the general education program in which a child . . . is enrolled, rather than mere variations in the program itself." *Concerned Parents*, 629 F.2d at 754. Thus, plaintiffs are incorrect to suggest that defendants concede that § 2164 resulted in a change in placement that would entitle plaintiffs to stay-put relief.

with its terms. *See Phillips*, 775 F.3d at 543; *supra* Background Part I.[11] Though plaintiffs object to the repeal of the religious exemption, the exemption itself was not a fundamental element of their children's educational placement. *Cf. Vinyard*, 901 F. Supp. 2d at 83 (holding that a parent may utilize the stay-put provision "when a school system proposes a 'fundamental change in, or elimination of, a basic element of the [then-current educational placement].'" (quoting *Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1582 (1984) (alteration in original))). Because the repeal does not constitute a change in placement, plaintiffs have no right under the IDEA to demand that a religious exemption be provided to their children.

This conclusion is further supported by the fact that the stay-put provision, as written and applied, is designed to preserve the existing placement for an *individual* child—not to enjoin systemic action. *See* 20 U.S.C. § 1415(j) (entitling a "child to remain in the then-current educational placement of the child" upon the initiation of a proceeding under the IDEA). Indeed, courts have acknowledged that the stay-put provision "was not intended to cover system-wide changes in public schools that affect disabled and non-disabled children alike." *N.D.*, 600 F.3d at 1107–08; *see also Tilton*, 705 F.2d at 804 ("Congress did not compel, as the price for federal participation in education for the handicapped, a wholesale transfer of authority over the allocation

---

[11] This fact also distinguishes § 2164 from the OCR and OSERS guidance letters cited by plaintiffs, which instruct schools to continue to provide special education services to unvaccinated children in the event of a closure or involuntary dismissal caused by a disease outbreak. *See supra* Background Part III. The OCR and OSERS letters provide guidance for schools facing an emergency situation that mandates immediate removal, with no opportunity for application of the stay-put provision. In these contexts, the OCR and OSERS letters explain that an extended exclusion would constitute a change in placement because the exclusion is automatic. Here, § 2164 provided clear deadlines for parents to comply with its requirements, and the statute did not immediately exclude children from schools. Moreover, the OCR and OSERS letters provide guidance for how schools should act when there is no statute that authorizes the removal of students who fail to comply with a state's permissible, system-wide vaccination requirements. As plaintiffs admit, the letters also do not directly address "non-medical exemptions and focus on children unable to attend school because of medical issues." Pls.' Reply 17. Thus, while plaintiffs urge deference to the agency guidance provided in these letters, they involve situations that are distinguishable from the instant case and therefore they do not alter my conclusions.

of educational resources from the duly elected or appointed state and local boards to the parents of individual handicapped children."). If an individual parent could enjoin any system-wide action that incidentally impacted her child's educational services, she would be granted "veto power over a state's decisions regarding the management of its schools." *N.D.*, 600 F.3d at 1117.[12]

As a result, I conclude that § 2164—a system-wide rule that applies equally to students with disabilities and those without—did not constitute a change in placement, and plaintiffs are therefore not entitled to either a stay-put order or notice and procedural safeguards under the IDEA.

## CONCLUSION

Plaintiffs' children qualify for services under the IDEA, and they are entitled to continue to receive those same services if they return to school. Their status as children with disabilities, however, does not entitle them to an injunction banning the enforcement of a neutral, widely-applicable state law. Plaintiffs' objection to the repeal constitutes an affirmative choice to opt-out of public, private, and parochial schools—not a unilateral action on the part of defendants that interferes with or alters their rights under the IDEA. As a result, and for the foregoing reasons, they are not entitled to either a preliminary injunction or a stay-put order, and their motion is DENIED.

SO ORDERED.

Date:   August 19, 2019                                              _____/s/_____
        Brooklyn, New York                                           Allyne R. Ross

---

[12] At the same time, I do not go so far as to hold that *no* system-wide, generally-applicable law can ever constitute a change in placement sufficient to trigger the stay-put provision or the IDEA's notice and procedural safeguards. In *D.M. v. New Jersey Department of Education*, the Third Circuit held that a parent was entitled to a stay-put order enjoining the application of a system-wide policy that prevented her child from receiving the mainstreaming services in her IEP, which required that she spend time with non-disabled students. *See* 801 F.3d at 218-19. In contrast to § 2164, the challenged state action in *D.M.* automatically and directly altered the services provided to the plaintiff's child pursuant to her IEP. It operated unilaterally, providing no opportunity for the parent to intervene to stop the application of the law. Here, plaintiffs can continue to ensure that their children are provided with services under the IDEA by obtaining vaccinations that would allow them to attend school.